UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CENTAURI SHIPPING LTD.,                    :

                  Plaintiff,              :        07 Civ. 4761 (KMK)

    - against -                           :

                                      ECF CASE

WESTERN BULK CARRIERS KS, WESTERN      :
BULK CARRIERS AS, and WESTERN BULK AS,
                                  :

                 Defendants.
-------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANT WESTERN BULK CARRIERS K/S'S
### MOTION TO VACATE THE MARITIME ATTACHMENT

Pursuant to Supplemental Rule E(4)(f) of the Federal Rules of Civil Procedure,

Defendant Western Bulk Carriers K/S (hereinafter "WBC") by and through its undersigned

counsel, Lennon, Murphy & Lennon, LLC, respectfully submits this Memorandum of Law in

support of its Motion to Vacate the June 5, 2007 Ex Parte Order for issuance of process of

maritime attachment and garnishment ("PMAG") issued pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule

B") and for dismissal of the Verified Complaint. The premise for WBC's motion is that the

Plaintiff's claim is premature, as it has does not even possess an accrued claim for damages, and

that Plaintiff has not otherwise met all of the requirements for obtaining an the Ex Parte Order

for maritime attachment in that WBC is "present" within the District, thus precluding Rule B

maritime attachment as a remedy available to the Plaintiff even if it did have a ripe claim.

### PROCEDURAL HISTORY

Plaintiff, Centauri Shipping Ltd. ("Centuari") commenced this action on June 5, 2007

claiming damages against WBC based on an alleged wrongful arrest of Centauri's vessel in

Angola and seeking enforcement under international comity principles of a Judgment issued by

the court in Angola. *See Declaration of Patrick F. Lennon (hereinafter "Lennon Decl."),*

Exhibit "1." Centauri also sought and obtained an Ex Parte Order for issuance of process of

maritime attachment and garnishment ("PMAG"). Centauri's counsel submitted an Affidavit in

support of Centauri's motion for an Ex Parte Order claiming that WBC could not be found

within the Southern District of New York and that it could find no records with the New York

Secretary of State, Department of Corporations relating to WBC. *See Affidavit annexed hereto*

*as Exhibit "2."* Although the Affidavit was clearly incorrect because WBC was, in fact,

registered with the New York Secretary of State, Department of Corporations, the Court, not

possessing accurate facts, issued the Ex Parte Order on June 5, 2007 in the sum of $15,350,796.

*Lennon Decl. ¶ 5, Exhibit "2," Gillingham Aukner Decl. ¶ 6, Exhibit "1."*

        Thereafter, Centuari proceeded to serve the PMAG on various garnishee banks within the

Southern District of New York. Over the period of the next several days, various electronic

funds transfers being routed through the garnishee banks, both those being paid by and to WBC,

were attached pursuant to the Ex Parte Order and PMAG. WBC then offered to provide a bond

in as substitute security for the attachment of WBC's funds in the hands of the garnishee banks.

Despite Centauri's objection to certain plain language in the bond, ultimately at a hearing before

the Court on June 15, 2007 the bond posted by WBC was accepted by Centauri. *Lennon Decl. ¶*

*3.* The Court then issued an Order vacating the attachment of funds in the hands of the garnishee

banks. *Lennon Decl., Exhibit "4."* .Subsequently, the garnishee banks released WBC's funds.

The bond issued by WBC was expressly conditioned to reserve all of WBC's rights, defenses

and remedies. In particular, the bond states that it is issued: "without waiver or prejudice of any

of WBC's rights including, but not limited to, Centauri's Complaint, the underlying claims

discussed therein which are subject to an ongoing Angolan court proceeding [and] ***the right to assert any defenses or rights in respect of Centauri's attachment filed in this Court* . . . .**" *Lennon Decl., Exhibit "3."*

## FACTS

### A.    WBC's presence in New York

WBC is, among other business lines, a lead player in the field of chartering and operating ocean going vessels for the carriage of dry bulk cargos world-wide. *See Accompanying Declaration of Sara Gillingham Aukner ¶ 3 (hereinafter "Gillingham Aukner Decl.")*. At any given time, WBC has commercial control of 50-70 vessels, many of which trade in the United States on a regular basis. *Id.* The level of trade is such that WBC has its own Standard Carrier Alpha Code ("SCAC Code") for use on all Bills of Lading for cargoes being transported to and from the United States and has established an International Carrier Bond (ICB). *Id.* WBC maintains its base of operations in Oslo, Norway. *Gillingham Aukner Decl. ¶ 4.*

In respect of its U.S. based business, WBC maintains a representative office in Seattle, Washington to aide its trade on the United States west coast. *Gillingham Aukner Decl. ¶ 5.* In addition, and in recognition of its U.S. east coast business, from June 22, 2005 WBC has been registered with the New York State Department of Corporations to conduct business in the State of New York as a foreign limited partnership. *Gillingham Aukner Decl. ¶ 6, Exhibit "1."* As part of WBC's registration with the New York State Department of Corporations, WBC has also had a registered agent for service of legal process in New York City since June 22, 2005. *Id.* This was a fact allegedly unknown to Centauri and its counsel before it filed the present action seeking to attach in excess of $15 million of WBC's assets, although in the exercise of ordinary diligence they should easily have found WBC's registration to do business in the State of New

York by routine inquiry with the New York Secretary of State, Department of Corporations. *Lennon Decl. ¶ 5, Exhibit "2."*

The various companies within the WBC group of companies have frequently been party to numerous lawsuits commenced in New York. Since approximately the year 2000, WBC KS is identified in approximately 90 separate docket entries as a party in this court alone, in the vast majority of which it was named as a defendant. *Gillingham Aukner Decl. ¶ 8, Exhibit "2."* In none of these cases did WBC ever formally contest court's personal jurisdiction over it. *Id.*

WBC also regularly transacts business within the State of New York in addition to many other states within the United States. *Gillingham Aukner Decl. ¶ 9.* For example, WBC has in the period 2005 to 2007 had many business transactions within the New York area with marine vessel and cargo brokers, suppliers and professionals. *Id.* In addition, it has had numerous vessels call at New York ports for cargo operations and/or to purchase marine fuel. Likewise, during any given year, WBC executives travel to New York anywhere from 4 - 6 times related to WBC business activities. *Gillingham Aukner Decl. ¶ 10.*

WBC has at all material times considered itself subject to the personal jurisdiction of United States courts, and in particular the courts of the State of New York. *Gillingham Aukner Decl. ¶ 11.* Since June 22, 2005 any party seeking to obtain jurisdiction over WBC in a legal proceeding commenced in New York merely had to serve legal process on WBC's appointed registered agent. *Gillingham Aukner Decl. ¶ 11, Exhibit "1."* Even before June 22, 2005 WBC never sought to contest jurisdiction over it in a lawsuit commenced in the State of New York, and in particular in any lawsuit commenced in this Court. *Gillingham Aukner Decl. ¶ 13.*

**B.    The dispute**

This dispute has its origins in a January 2004 freight forward "swap" agreement ("FFA")

between WBC and Navitrans Maritime Inc. ("Navitrans"). *See Accompanying Ridings*

*Declaration (hereinafter "Ridings Decl.") ¶ 4.* FFAs are, in essence, contracts for the payment

of any difference between the stated contract rate and the specified fluctuating freight indices.

These types of contract are often used by WBC in order to hedge its freight exposure in relation

to the physical chartering and re-letting of vessels, which is the substance of WBC's business.

*Id., Exhibit ASR 1 at pages 9 – 13 and 26 – 30.* Navitrans breached not only the January 2004

FFA, but a separate June FFA contract. *Ridings Decl. ¶¶ 4-8.* As a result of Navitrans' breach

of both the January and June FFAs, proceedings were commenced by WBC against Navitrans in

the High Court of Justice in London, England (as required by the law and jurisdiction clauses in

both FFAs). *Ridings Decl. ¶ 9.* In relation to the January FFA those proceedings were

commenced on 6 January 2005 and in relation to the June FFA on 15 February 2005. *Ridings*

*Decl. ¶ 9, Exhibit ASR 1 pages* 1 – 33. Ultimately, judgments were issued in favor of WBC and

against Navitrans by the High Court in the amounts of $843,415.92 (plus costs) in relation to the

January FFA and $5,187,631.31 (plus costs) in respect of the June FFA. *Ridings Decl. ¶ 10,*

*Exhibit ASR 1 pages 34-39.*

Concurrent with the issue of proceedings in England, WBC was also seeking to secure its

claim against Navitrans. *Ridings Decl. ¶ 11.* Following detailed investigations, WBC's

representatives concluded that there was a network of companies related to Navitrans. It

appeared that each of those companies was ultimately beneficially owned by the brothers Ioannis

and Evgenios Tingas, citizens of Greece. *Ridings Decl. ¶ 12.* WBC's legal representatives and

investigators ultimately ascertained during the investigation, and by virtue of affirmative

5

representations made by Navitrans and its agents and/or representatives, that Navitrans directly or indirectly owned and managed at least three vessels, one of which was the M/V "Centauri." *Ridings Decl. ¶ 13.*

As a result of those investigations WBC learned that the M/V "CENTAURI" would be calling at Luanda, Angola in February 2005. *Ridings Decl. ¶ 14.* WBC retained lawyers in Angola to arrest the M/V "Centauri" in order to secure WBC's claims on the judgments against Navitrans. *Id., Exhibit ASR 1 pages 40-51.* Following the Vessel's arrest, lawyers for Centauri Shipping filed detailed submissions to the Angolan court. *Ridings Decl. ¶ 17, Exhibit ASR 1 pages 52-76.* The Angolan court then issued a second Arrest Order upholding the original Order confirming the arrest of the M/V "Centauri" and that Centauri Shipping pay $858,673.47 or provide a suitable guarantee to WBC as security in exchange for release of the Vessel. *Ridings Decl. ¶ 18, Exhibit ASR 1 pages 77-84.* Centauri Shipping failed to avail itself of the right to post the required security to obtain the release of the Vessel, choosing instead to leave the Vessel sitting idly while it pursued appeals in the Angolan courts. *Ridings Decl. ¶ 18.*

As a result of the further Arrest Order, Centauri Shipping appealed to the Angolan Supreme Court, including very detailed submissions filed on Centauri's behalf in September 2005. *Ridings Decl. ¶ 19, Exhibit ASR 1 pages 85-105.* Under Angolan procedures, WBC did not have an automatic right to make an opposition submission to Centauri's appeal, but rather was required to await a request to do so by the Angolan Supreme Court. *Ridings Decl. ¶ 20.* WBC's Angolan lawyers never received such a request from the Angolan Supreme Court. Then, in November 2006 the Angolan Supreme Court issued a judgment in favor of Centauri lifting the arrest. *Id., Exhibit ASR 1 pages 106 – 128.*

The Angolan Supreme Court Judgment came as a complete surprise to WBC and its lawyers as no opportunity had been given to them to make any submissions at all. *Ridings Decl. ¶ 21.* Immediately, WBC's Angolan counsel filed an appeal against the Supreme Court Judgment on the grounds that WBC had no opportunity to make any submissions. *Id., Exhibit ASR 1 pages 129-134.* However, very shortly thereafter the Angolan Supreme Court issued a further order dismissing WBC's appeal. *Id., Exhibit ASR 1 pages 135-138.* Consequently, the Angolan Supreme Court Judgment in Centauri's favor stands and WBC has no further right to appeal in the Angolan courts. *Ridings Decl. ¶ 22.*

WBC's Angolan counsel has advised, however, that in order to pursue a claim for money damages in relation to the Vessel arrest and the Angolan Supreme Court Judgment, Centauri will have to commence entirely new proceedings in Angola in the Maritime Court. *Ridings Decl. ¶ 23.* Therefore, at present there is no "money judgment" awarding any sums to Centauri as against WBC. *Id.* In addition, Centauri has not even commenced a proceeding before the Angolan courts seeking money damages against WBC in relation to the arrest of the M/V "Centauri" or otherwise. *Id.*

A plain reading of the "Decision" section of the Angolan Supreme Court Judgment makes clear that <u>neither the Judgment itself nor any part of that Judgment awards money damages to Centauri Shipping and as such is not an enforceable money Judgment</u>. *Ridings Decl. ¶ 24.* This has been confirmed by WBC's Angolan counsel. *Id.* The sums of Kz 450,000 and Kz 85,000 mentioned in the final page of the Judgment under the section headed "DECISION" are sums to be paid to the Angolan Supreme Court and <u>not</u> sums to be paid to Centauri. *Id.*

After the Angolan Supreme Court rendered its Judgment, and despite that no money damages were awarded to it against WBC, Centauri commenced the present action on or about June 5, 2007. Centauri claims in its Verified Complaint is as follows:

> The matter is ***presently pending before the Angolan court to determine the amount of damages*** that will be awarded to plaintiff for the wrongful arrest of the Vessel."

*Lennon Decl., Exhibit "1," ¶ 14.*

As set forth at paragraphs 23 and 24 of the accompanying Declaration of Andrew Ridings it is clear that the allegation set forth in Centauri's Verified Complaint at paragraph 14 is simply incorrect. There are no active, pending proceedings before the Angolan courts in relation to the disputes between Centauri and WBC. Moreover, in order for Centauri to even possess the possibility of recovering a money judgment against WBC it will be required to commence new proceedings before the Angolan courts which, to date, it has not done. At paragraph 17 of its Verified Complaint Centauri asserts conclusory damage claims allegedly arising from the arrest of its vessel by WBC in Angola. Yet, despite claiming such damages in the action before this Court, it is clear that Centauri has failed to take even the first step to obtain an enforceable money judgment before the Angolan courts. Nonetheless, the prayer for relief in Centauri's Verified Complaint states:

> [T]his Court enforce and accord international comity to the judgments entered by the Angolan courts . . . .

*Lennon Decl., Exhibit "1," prayer for relief ¶ C.* Thus, Centauri's sole claim before this Court, in which it has attached WBC's funds in the sum of $15,350,796.00, is for recognition and enforcement of the existing judgments issued by the Angolan courts, none of which awards Centauri *any* money damages against WBC.

**ARGUMENT**

**POINT I**

**UNDER SUPPLEMENTAL ADMIRALTY RULES B AND E
PLAINTIFF BEARS THE BURDEN OF ESTABLISHING THAT
IT HAS MET ALL REQUIREMENTS FOR ISSUANCE OF AN EX PARTE
ORDER FOR MARITIME ATTACHMENT AND GARNISHMENT
AND THAT THE ATTACHMENT SHOULD NOT OTHERWISE BE VACATED**

A Rule B maritime attachment will not issue unless the plaintiff can establish that: (1) it has alleged a prima facie valid maritime claim against the defendant; (2) the defendant is not present in the district; (3) defendant's property can be found in the district; and (4) no other statutory bar to maritime attachment exists. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 439, 445 (2d Cir. 2006). In addition, "a district court *must vacate* an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." *Id.* (emphasis added). Rule E(4)(f) further provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." *J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*, 2007 U.S. Dist. LEXIS 10074, * 6-7 (S.D.N.Y. 2007) (quoting Fed. R. Civ. P. Supp. R. E(4)(f)).

Thus, it is a Plaintiff's burden at the post-attachment hearing to show that it has met all of the requirements of Rule B as set out in the Second Circuit's decision in *Aqua Stoli, supra.* As is established by the supporting Declarations of Andrew Ridings and Sara Gillingham Aukner and herein, Plaintiff will be unable to carry its burden because it cannot show that WBC is "not present within the District" and also because it has asserted a completely speculative and premature claim for relief.

9

## POINT II

## DEFENDANT WESTERN BULK CARRIERS K/S
## IS "PRESENT" WITHIN THE DISTRICT

As set forth above, one of the required elements for an order of attachment is that the

defendant cannot be "found within the district." *See* Supplemental Admiralty Rule B(1)(a), (b).

As explained by the court in *Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GMBH & Co.*

*KG*, 409 F. Supp. 427 (S.D.N.Y. 2006) (overruled on other grounds, *Aqua Stoli Shipping Ltd.*

*v. Gardner Smith Pty Ltd.*, 460 F.3d 439, 446-447 (2d Cir. 2006)) the test for whether a

defendant can, in fact, "be found" within the district is not black and white:

> [t]he Rule does not define the phrase "found within the district" - a choice that
> was made consciously by the Rule's drafters. *See* Advisory Committee Notes to
> Rule B (1966 Adoption) ("The rules have never defined the clause, 'if the
> defendant shall not be found within the district,' and no definition is attempted
> here. The subject seems one best left for the time being to development on a case-
> by-case basis."). The Second Circuit has held that this requirement presents "a
> two-pronged inquiry: First, whether (the respondent) can be found within the
> district in terms of jurisdiction, and second, if so, whether it can be found for
> service of process." *Seawind Compania, S. A. v. Crescent Line, Inc.*, 320 F.2d
> 580, 582 (2d Cir. 1963) (citations and internal quotes omitted).

*Erne,* 408 F.Supp.2d at 432. As did the court in *Erne,* most courts addressing this question have

followed the Second Circuit's two-pronged test established in *Seawind.*

Although WBC can quite clearly establish the second prong of the *Seawind* "presence"

test by virtue of the fact that since June 2005 it has had a designated agent for service of process

within the Southern District of New York (*see Gillingham Aukner Decl. ¶ 6, Exhibit "1"*), it

does not contend that it could be found within the district "in terms of jurisdiction," at least

insofar as that term has been interpreted by courts in the Rule B context since *Seawind.* In

particular, and as was also well-summarized by the *Erne* court,

> Most case law reflects that satisfaction of the jurisdictional prong of the Rule B
> analysis turns on whether the defendant has "minimum contacts" with the forum

state as required by the Due Process Clause -- not whether the forum state's jurisdictional statute would permit suit against the defendant. Thus, the Second Circuit has stated in dictum that the test for being "found" in a district under Rule B is whether the defendant has "'sufficient contacts with the district to meet minimum due process standards.'" *Winter Storm*, 310 F.3d at 268 (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 J. Mar. L. & Com., No. 4 (Oct. 1989), at 521) . . . .

*Erne,* 408 F.Supp.2d at 432.

Reasoning that federal law and New York state law on the point were in harmony, the *Erne* court then applied the "continuous and systematic" formulation to determine whether a corporation is present for purposes of general jurisdiction, which the court explained "permits a court to exercise jurisdiction over a foreign corporation on any cause of action if the defendant is 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of "presence" in this jurisdiction.'" *Erne*, 432 F.Supp.2d at 433 (*citing McGowan v. Smith*, 52 N.Y.2d 268, 272, 419 N.E.2d 321, 437 N.Y.S.2d 643 (1981) (quoting *Simonson v. Int'l Bank*, 14 N.Y.2d 281, 285, 200 N.E.2d 427, 251 N.Y.S.2d 433 (1964)).  Applying the "continuous and systematic" test to the defendant's contacts within the district, the *Erne* court found that they fell "far short" and, thus, concluded that for purposes of Rule B attachment the defendant could not be found within the district.  WBC concedes that despite its numerous contacts with the Southern District of New York (*see Gillingham Aukner Declaration*), such contacts would not meet the "continuous and systematic" test that has been applied by the courts on a "case-by-case" basis.

Nonetheless, WBC *does* contend that this Court should conclude that it can be "found" within the Southern District of New York for Rule B purposes.  Specifically, WBC maintains that all of the case law on this issue, as collected and summarized by the *Erne* court, *supra*, is inapposite in situations where a defendant has filed papers and obtained authority to conduct

11

business within the jurisdiction (including the district) and thus appointed an agent for service of

legal process and further subjected itself to general jurisdiction within the jurisdiction (and the

district).  Under such circumstances, a defendant should be considered "found" within the district

for Rule B purposes because the fundamental underlying purpose of the maritime attachment

remedy is already satisfied and available to any party with a claim against the defendant, *i.e.* the

defendant is subject to *in personam* jurisdiction within the district for *any* claim.

WBC's position is not novel and has, in fact, been accepted in the Fourth Circuit and in

the Second Circuit, albeit in *dicta.  See, Maritrans Operating Partners Ltd. Partnership v. M/V

Balsa 37*, 64 F.3d 150 (4th Cir. 1995); and *Seawind Compania, S. A. v. Crescent Line, Inc.*, 320

F.2d 580 (2d Cir. 1963).  In *Maritrans,* the Court agreed with the defendant's contention that:

> because the Clerk of the State Corporation Commission is statutorily appointed
> under the Virginia Code to accept service of process, he is found within the
> district under Supplemental Admiralty Rule B as interpreted by LAR (1)(b). . . .
> Virginia Code Section 13.1-758F provides for substituted service on the Clerk of
> the State Corporation Commission where a foreign corporation without certificate
> of authority transacts business in the Commonwealth but has no director, officer
> or agent within the Commonwealth on which to serve process. Clearly, Maritrans
> had an agent authorized by law upon which to serve process under Rule 4(d), and
> thus does not fall within the LAR's definition of 'not found within the district'
> under Admiralty Rule B."

*Maritrans*, 64 F.3d at 154.  Concededly, the *Maritrans* case dealt with a local admiralty rule

providing a narrow definition of "not found within the district."  Nevertheless, the Court vacated

the attachment on the ground that the defendant could be served with process within the district.

Here, as is set forth above, there is no dispute as to whether WBC could be served with process

within the district since it has had an appointed agent for service of process within the Southern

District of New York since June 2005. *See Gillingham Aukner Decl. ¶ 6, Exhibit "1."*

Centauri's counsel's failure to discover this fact during its due diligence investigation to

determine whether WBC was present within the District, and to disclose it to the Court when

applying for the Ex Parte Order for maritime attachment, simply provides further support for vacatur of the attachment on equitable grounds.

When analyzed through the prism of the underlying purpose of the Rule B attachment remedy, the logical force of WBC's argument becomes clear. It is by now universally accepted (especially within the Second Circuit) that the primary purpose of Rule B attachment is to obtain jurisdiction over a foreign defendant. A secondary purpose of the attachment remedy is to provide security for the plaintiff's claim. It is, however, also universally accepted that the plaintiff cannot obtain such security without proving a *prima facie* need to obtain jurisdiction over the foreign defendant – the assumption being that the foreign defendant is not otherwise "present" in the district where the suit is filed.

The foregoing principles have been clearly recognized by the Second Circuit. For example, in *Aqua Stoli, supra,* the Court stated:

> Maritime attachments arose because it is frequently, but not always, more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action. Maritime parties are peripatetic, and their assets are often transitory. *See In re Louisville Underwriters*, 134 U.S. 488, 493, 10 S. Ct. 587, 33 L. Ed. 991 (1890). Thus, the traditional policy underlying maritime attachment has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment. *See Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 655 (2d Cir. 1979).
>
> This policy has been implemented by a relatively broad maritime attachment rule, under which the attachment is quite easily obtained. As Judge Leval explained in *Integrated*: [A]ttachment is precluded under Admiralty Rule B(1) only if the defendants have engaged in sufficient activity in the district or the cause of action has sufficient contacts with the district to permit the court to exercise *in personam* jurisdiction over the defendants . . . *and* in addition can be found within the geographical confines of the district for service of process. *Integrated*, 476 F. Supp. at 122 (citing *Seawind Compania, S.A.,* 320 F.2d at 582; *Antco Shipping Co.*, 318 F. Supp. 626).

*Aqua Stoli*, 460 F.3d at 443-444. Also, and more specifically, in *Seawind Compania, S. A. v. Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir. 1963) the Court plainly stated that Rule B "cannot be used purely for the purpose of obtaining security: 'The two purposes may not be separated, however, for ***security cannot be obtained except as an adjunct to obtaining jurisdiction.***'" *Id.* (emphasis added).

Here, it is rather obvious that Centauri's sole purpose in coming to New York was to obtain security for claims it will assert against WBC in Angola, where the Angolan courts already enjoy jurisdiction over WBC. More to the point, however, is the fact that under no circumstances can Centauri make the claim that it needed to attach WBC's assets in order to obtain personal jurisdiction over WBC in the Southern District of New York. WBC's registration with the New York Secretary of State, Department of Corporations in June 2005 provided a most expedient and available means for Centauri, and any other party with a claim against WBC for that matter, to commence an action against WBC in the Southern District of New York over which any court, state or federal, would automatically have jurisdiction over WBC *in personam*.

Thus, if the Court accepts, as WBC asserts it must, that Centauri did not need to attach WBC's assets to gain personal jurisdiction over WBC in New York for purposes of seeking to enforce a future, and at this point hypothetical and un-accrued, Angolan money judgment under principles of international comity, then it is beyond peradventure that Centauri made illegitimate and abusive use of the Rule B attachment remedy. Accordingly, because WBC was sufficiently "present" within the Southern District of York, both jurisdictionally and for purposes of service of process, the Court's June 5, 2007 Ex Parte Order for issuance of a PMAG against WBC must

be vacated, as the conditions for issuance of such process did not exist. *See Aqua Stoli,* 460 F.3d at 445.

## POINT III

### THE ATTACHMENT MUST BE VACATED BECAUSE CENTAURI HAS FAILED TO ASSERT A RIPE MARITIME CLAIM AND THE ATTACHMENT OF WBC'S PROPERTY IS OTHERWISE INEQUITABLE

Centauri cannot carry its burden under Supplemental Admiralty Rule E(4)(f) to show cause why the attachment of WBC's assets should not be vacated because no matter how it may attempt to portray its claim against WBC in respect of the litigation in Angola, at this point such claim, at least in the action before this Court, is nothing more than an unripe, premature claim for recognition of a money judgment. Centauri's claim is premature because at the time it commenced this action, and even now, it did not possess a money judgment against WBC issued by the Angolan courts capable of recognition and enforcement in this action. Put another way, because Centauri's claim is premature and theoretical, Centauri has not asserted a *prima facie* valid maritime claim sufficient to justify utilization of Supplemental Admiralty Rule B. Lack of a prima facie valid maritime claim is one of the bases recognized by the Second Circuit in *Aqua Stoli* for vacatur under Supplemental Admiralty Rule E of a maritime attachment. *Aqua Stoli,* 460 F.3d at 445.

In addition, the attachment of WBC's property under the circumstances is inequitable because Centauri has not even taken the first step toward obtaining a money judgment against WBC, *i.e.* the commencement of an affirmative action in the Angolan courts to obtain a money judgment against WBC based on the Angolan Supreme Court's Judgment finding that WBC

15

allegedly, wrongfully arrested Centauri's Vessel.[1]  The *Aqua Stoli* Court made clear that its

holding setting forth the general bases upon which an attachment may be vacated was not

exclusive.  In particular, the Court noted that:

> a district court must vacate an attachment if the plaintiff fails to sustain his burden
> of showing that he has satisfied the requirements of Rules B and E. ***We also***
> ***believe vacatur is appropriate in other limited circumstances.***

*Aqua Stoli*, 460 F.3d at 445 (emphasis added).  The Court approvingly referred to a district

court's inherent equitable powers to vacate an inequitable attachment, stating: "Although Rule E

does not explicitly mention a district court's equitable power to vacate an attachment or who

bears such a burden, former Local Rule 12 required the defendant to establish any *equitable*

grounds for vacatur, and we believe that defendants still bear that burden." *Id.* at fn. *5*

(emphasis added).  The *Aqua Stoli* Court clearly countenanced the vacatur of an inequitable

attachment, such as the one involved here.

Thus, even if Centauri were able to establish that its premature indemnity claim

constituted a *prima facie* valid maritime claim, this Court nevertheless would be within its

discretion to vacate the attachment on equitable grounds since Centauri has attached in excess of

$15 million of WBC's property seeking recognition of a purely theoretical money judgment it

hopes to obtain from the Angolan courts in a proceeding it has yet to even commence.  Add to

that the fact that Centauri's counsel failed to discover and disclose to the Court the facts relating

to WBC's presence within the District at the time they filed the motion for the Ex Parte Order for

maritime attachment and the inequity is patent. *See Lennon Decl. ¶ 5, Exhibit "2;" Gillingham*

*Aukner Decl. ¶ 6, Exhibit "1."*

---

[1]     It is worthwhile noting that WBC objects to the Angolan Supreme Court judgment as having been rendered
in violation of WBC's due process rights.  A copy of the objection and protest WBC will lodge with the Angolan
courts is annexed as Exhibit "1" to this Memorandum of Law.

The relief Centauri seeks in this action is specifically to have "this Court enforce and accord international comity to the judgments entered by the Angolan courts . . . ." *Centauri Verified Complaint, prayer for relief ¶ C.* As is established in the accompanying Declaration of Andrew Ridings, WBC's solicitor who oversaw the Angolan arrest proceedings on WBC's behalf, none of the judgments issued to date by the Angolan courts constitute a money judgment. *See Ridings Decl. ¶¶ 22-24.* Thus, even assuming *arguendo* this Court were to summarily accord international comity to the already issued Angolan Judgment in Centauri's favor against WBC, this Court could not issue a money judgment in this action because the Angolan Judgment did not award Centauri *any* money damages against WBC whatsoever. Accordingly, the existing Angolan Judgment provides no justification for the attachment of WBC's property in excess of $15 million.

Ultimately, Centauri must obtain a money judgment against WBC from the Angolan courts before it even has a viable right to attach *any* funds of WBC pursuant to Rule B. In turn, in this proceeding Centauri would then be required to seek enforcement of that money judgment (which as of now is purely theoretical). "Under federal law, the recognition of foreign judgments and proceedings is governed by principles of comity." *Victrix Steamship Co., S.A., v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir. 1987) (*citing Hilton v. Guyot,* 159 U.S. 113, 164, 40 L. Ed. 95, 16 S. Ct. 139 (1895). "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix,* 825 F.2d at 713 (*citing Hilton,* 159 U.S. at 202-03 and *Cunard Steamship Co., Ltd. v. Salen Reefer Services A.B.,* 773 F.2d 452, 457 (2d Cir. 1985).

However, actions brought in New York to enforce foreign judgments are subject to New York law, and in particular Article 53 of the New York Civil Practice Law & Rules ("CPLR"), entitled the New York Uniform Foreign Country Money Judgments Recognition Act ("NYUFCMJRA").[2] *In re Union Carbide Corp. Gas Plant Disaster at Bhopal*, 809 F.2d 195 (2d Cir. 1985) (citing *Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313, 1318 (2d Cir. 1973), *cert. denied*, 416 U.S. 986, 40 L. Ed. 2d 763, 94 S. Ct. 2389 (1974)). *See also Victrix*, 825 F.2d at 715 ("Enforcement of foreign money judgments under New York law is governed by the Uniform Foreign Country Money-Judgments Recognition Act, N.Y. Civ. Prac. L. & R. § 5301 *et seq.* (2007), adopted in 1970 as a codification of New York common law . . . . The Act requires a court to enforce a 'conclusive' and valid foreign money judgment subject to seven discretionary bases for nonenforcement. N.Y. Civ. Prac. L. & R. 5304(b)").

More particularly, CPLR section 5301 provides the following definition of the type of judgment that is entitled to recognition and enforcement under the NYUFCMJRA:

> As used in this article the following definitions shall be applicable.
>
> (b) Foreign country judgment. "Foreign country judgment" in this article means any judgment of a foreign state *granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty*, or a judgment for support in matrimonial or family matters.

N.Y. Civ. Prac. L. & R. § 5301 (2007). Thus, because the Angolan Supreme Court Judgment upon which Centauri must rely does *not* grant recovery of a sum of money it is specifically *not* entitled to recognition and enforcement under the NYUFCMJRA. *See Burelle v. Gilbert*, 806 N.Y.S.2d 443; 2005 N.Y. Misc. LEXIS 1999 (2d Dept. 2005); *Cecuk v. MacAdoo*, 284 A.D.2d 188, 726 N.Y.S.2d 421 (1st Dept. 2001).

---

[2]    In states that have not adopted the Uniform Foreign Money-Judgments Recognition Act, foreign judgments may be recognized according to principles of comity. *See Hilton v. Guyot*, 159 U.S. 113, 40 L.Ed. 95, 16 S.Ct. 139 (1895). However, as New York has adopted the Act, Centauri's claim seeking recognition of the Angolan Judgment and damages for the alleged wrongful arrest of its vessel are governed by the Act.

As is set forth above, however, based on Centauri's attachment of WBC's property in excess of $15 million as security for alleged damages arising from the alleged wrongful arrest of Centauri's vessel, it is clear that what Centauri ultimately seeks in this proceeding is a money judgment in damages against WBC. The problem with the posture of this case, however, is that Centauri has no money judgment to enforce and has not even commenced a proceeding in the Angolan courts that would potentially result in such a money judgment.[3] Even assuming *arguendo*, that Centauri ultimately does obtain from the Angolan courts an enforceable money judgment against WBC, it will ultimately have to prove it is entitled to recognition and enforcement of the Angolan judgment under the NYUFCMJRA.

At this juncture, however, the attachment of WBC's funds is entirely premature as Centauri has no present claim for enforcement of a money judgment under the NYUFCMJRA, and it is speculative as to when, if ever, Centauri may obtain an enforceable money judgment against WBC. Centauri cannot even provide a basis for estimating when it might possess such a money judgment against WBC because it has not commenced the necessary underlying proceeding in the Angolan courts. "The determination of whether . . . claims [are] ripe turns on the question of whether there were any amounts due . . . at the time" the action is commenced. *Patricia Hayes & Assocs. v. Cammell Laird Holdings U.K.*, 56 F.3d 76, 82 (2d Cir. 2003).

In addition, it is noteworthy that Centauri is not even entitled to recognition of the Angolan Judgment[4] already issued by the Angolan Supreme Court because it merely provides for

---

[3]     It is telling that more than two months after it attached in excess of $15 million of WBC's property, Centauri still has not commenced the necessary proceeding in the Angolan courts to even obtain an enforceable money judgment against WBC.

[4]     As is set forth above at footnote 1, WBC has objected to the Angolan Supreme Court Judgment on the basis that it was issued without notice and an opportunity to oppose Centauri's appeal and to submit evidence having been afforded to WBC. While enforceability is an issue for another day, it is worthwhile noting that regardless of the fact that the Angolan Judgment is not a money judgment that this Court may enforce, and therefore cannot provide the

fines against WBC, which under the provisions of the NYUFCMJRA are specifically *not* entitled to recognition and enforcement. In any case, the fines imposed on WBC by the Angolan judgment are not payable to Centauri. *See Ridings Decl. ¶ 24.*

As this Court held in the context of a motion to vacate a Rule B attachment, it is the plaintiff's burden to prove its claim is ripe. *See J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.,* 2007 U.S. Dist. LEXIS 10074, * 11 (S.D.N.Y. 2007) (discussing unripe indemnity claim); see also *Eitzen Sealift A/S v. Cementos Andinos Dominicanos, SA,* 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005) (holding that attachment was premature because London arbitration had not been initiated). In *Patricia Hayes & Assocs. v. Cammell Laird Holdings U.K., supra,* the Second Circuit affirmed the district court's dismissal a sureties' claims because they could not prove they possessed an accrued claim. In particular, the Court held:

> Thus, Sureties' claims were unripe not because Sureties failed to provide sufficient evidence to support their allegations, but rather because their allegations, taken as true, were insufficient to support their claim. Because Sureties had not paid any claims under the FMC bond by the time their motion to intervene was denied, there was no amount due under the contract at that time. Without a debt due, Sureties could not have a maritime lien to enforce against BRBII. Thus, we find no error in the district court's conclusion that Sureties' claims were unripe.

56 F.3d. at 82-83. The facts and principles at issue in this case are identical. Centauri did not possess an accrued claim for enforcement of a money judgment against WBC at the time it filed its Verified Complaint and attached in excess of $15 million of WBC's funds.

Accordingly, to the extent Centauri will claim money damages against WBC in this proceeding on the basis of events and proceedings in Angola to date, its claim is by definition

---

underlying basis for Centauri's attachment of WBC's funds, it also suffers from a fatal defect under the New York Uniform Foreign Country Money Judgments Recognition Act because WBC "did not receive notice of the [Angolan Supreme Court] proceedings in sufficient time to enable [it] to defend against Centauri's appeal," which was effectively therefore issued on default. *See* N.Y. Civ. Prac. L. & R. § 5304(b)(2).

premature, unripe and has not yet accrued because it has yet to obtain a money judgment against WBC in the Angolan courts. Moreover, it has yet to commence the required proceeding in the Angolan courts to obtain such a money judgment. To put it colloquially, Centauri has "jumped the gun" and abusively attached in excess of $15 million of WBC's property in this action for enforcement of a non-existent, entirely theoretical Angolan money judgment which it may not even obtain. The attachment is, therefore, wrongful and abusive and the Court should exercise its discretion and immediately vacate the attachment and dismiss the Verified Complaint.

### CONCLUSION

WHEREFORE, for all of the foregoing reasons, Western Bulk Carriers K/S respectfully requests that this Court grant its motion to vacate the attachment, dismiss the Verified Complaint and order Plaintiff to return the bond it has posted.

Dated: August 10, 2007
New York, NY

The Defendant,
WESTERN BULK CARRIERS K/S

By:

Patrick F. Lennon (PL 2162)
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com

## **AFFIRMATION OF SERVICE**

I hereby certify that on August 10, 2007, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Patrick F. Lennon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CENTAURI SHIPPING LTD.,                          :

                              Plaintiff,         :         07 Civ. 4761 (KMK)

        - against -                              :
                                                           ECF CASE
WESTERN BULK CARRIERS KS, WESTERN    :
BULK CARRIERS AS, and WESTERN BULK AS,
                                                 :
                              Defendants.
--------------------------------------------------------------X

## NOTICE OF MOTION

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 7(b),

Supplemental Admiralty Rule E(4)(f) and Local Rule 6.1 of the Local Civil Rules for the

Southern District of New York and upon the annexed Declarations of Sara Gillingham Aukner,

in-house Legal Counsel of Defendant Western Bulk Carriers A/S, the managing partner of

Defendant Western Bulk Carriers K/S, Andrew S. Ridings, English solicitor for Western Bulk

Carriers K/S in relation to this matter, and Patrick F. Lennon, and the accompanying

Memorandum of Law, and all the pleadings and proceedings had herein, Defendant Western

Bulk Carriers moves this Court before the Honorable Kenneth M. Karas as soon as counsel may

be heard, for an order vacating the Court's June 5, 2007 Ex Parte Order for issuance of Process

of Maritime Attachment and Garnishment and dismissing the Verified Complaint.  Answering

papers are to be served in accordance Local Civil Rule 6.1.

Dated: August 10, 2007
        New York, NY

The Defendant
WESTERN BULK CARRIERS K/S

By: _____
    Patrick F. Lennon (PL 2162)
    LENNON, MURPHY & LENNON, LLC
    The GrayBar Building
    420 Lexington Avenue, Suite 300
    New York, NY 10170
    (212) 490-6050 - phone
    (212) 490-6070 - facsimile
    pfl@lenmur.com

2

## **AFFIRMATION OF SERVICE**

I hereby certify that on August 10, 2007, a copy of the foregoing Notice of Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Patrick F. Lennon

LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 – Ph.
(212) 490-6070 – Fax

Attorneys for Defendant
WESTERN BULK CARRIERS KS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
CENTAURI SHIPPING LTD.,                                    :        07 CIV 4761 (KMK)

                          Plaintiff,                       :        **ECF CASE**

        - against -                                        :

WESTERN BULK CARRIERS KS, WESTERN               :
BULK CARRIERS AS, and WESTERN BULK AS,
                                                           :
                          Defendants.
------------------------------------------------------------------------------X

## ATTORNEY DECLARATION OF PATRICK F. LENNON
## IN SUPPORT OF WESTERN BULK CARRIER K/S'S
## MOTION TO VACATE MARITIME ATTACHMENT

        Patrick F. Lennon declares under penalty of perjury of the laws of the United States of

America as follows:

        1.      I am an attorney admitted to practice before this Honorable Court and act as

counsel for the Defendant herein, Western Bulk Carriers K/S ("WBC").

        2.      I submit this Declaration based on facts and information known to me personally,

as well as documents and information provided to me by WBC and its representatives, all of

which I believe to be true and accurate.

3.      Plaintiff, Centauri Shipping Ltd. ("Centauri") commenced this action on June 5, 2007 claiming damages against WBC based on an alleged wrongful arrest of Centauri's vessel in Angola and seeking enforcement under international comity principles of a Judgment issued by the court in Angola. *See Plaintiff's Verified Complaint annexed hereto as Exhibit "1."*

4.      Centauri also sought and obtained an Ex Parte Order for issuance of process of maritime attachment and garnishment ("PMAG").

5.      Centauri's counsel submitted an Affidavit in support of Centauri's motion for an Ex Parte Order claiming that WBC could not be found within the Southern District of New York and that it could find no records with the New York Secretary of State, Department of Corporations relating to WBC. *See Affidavit annexed hereto as Exhibit "2."*

6.      The Court issued the Ex Parte Order on June 5, 2007 in the sum of $15,350,796. *See Ex Parte Order annexed hereto as Exhibit "3."*

7.      Thereafter, Centuari proceeded to serve the PMAG on various garnishee banks within the Southern District of New York. Over the period of the next several days, various electronic funds transfers being routed through the garnishee banks, both those being paid by and to WBC, were attached pursuant to the Ex Parte Order and PMAG.

8.      WBC then offered to provide a bond in as substitute security for the attachment of WBC's funds in the hands of the garnishee banks.

9.      Despite Centauri's objection to certain plain language in the bond, ultimately at a hearing before the Court on June 15, 2007 the bond posted by WBC was accepted by Centauri. *See Bond annexed hereto as Exhibit "4."*

10.    The Court then issued an Order vacating the attachment of funds in the hands of the garnishee banks. Subsequently, the garnishee banks released WBC's funds. *See Order annexed hereto as Exhibit "5."*

11.    The bond issued by WBC was expressly conditioned to reserve all of WBC's rights, defenses and remedies. In particular, the bond states that it is issued: "without waiver or prejudice of any of WBC's rights including, but not limited to, Centauri's Complaint, the underlying claims discussed therein which are subject to an ongoing Angolan court proceeding [and] ***the right to assert any defenses or rights in respect of Centauri's attachment filed in this Court* . . . ."** *See Bond annexed hereto as Exhibit "4."*

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on August 10, 2007

PATRICK F. LENNON

## AFFIRMATION OF SERVICE

I hereby certify that on August 10, 2007, a copy of the foregoing Attorney Declaration of

Patrick F. Lennon was filed electronically and served by mail on anyone unable to accept

electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties

may access this filing through the Court's CM/ECF system.

Patrick F. Lennon

# EXHIBIT "1"

## PAYMENT OF FINES UNDER PROTEST

To Whom It May Concern:

Western Bulk Carriers, KS hereby gives notice that it is paying the following amounts, under protest and with full reservation of all rights and remedies, pursuant to the decision rendered by the Supreme Court of the Republic of Angola in Case No. 955/05:

First amount:        kz24,000 (Twenty Four Thousand kwanza);
Second amount:    kz450,000 (Four Hundred Fifty Thousand kwanza; and
Third amount:       kz850,000 (Eight Hundred Fifty Thousand kwanza).

The payment of the referenced fines by Western Bulk Carriers KS is made under protest and should not be interpreted in any way as an acceptance by Western Bulk Carriers KS of the validity of the fines or the validity of the Angolan Supreme Court decision judgment in Case No. 955/05.

Western Bulk Carriers, KS is paying the referenced fines imposed by the Angolan Supreme Court, under protest, for the following reasons:

1.    The Angolan Supreme Court rendered the decision imposing fines against Western Bulk Carriers KS without affording it basic procedural and substantive due process rights by denying it the right to make submissions in support of its legal rights, by denying it a hearing and by concluding that it had litigated in bad faith by arresting the M/V Centauri, despite evidence submitted by Western Bulk Carriers KS in Case No. 955/05 establishing that the defendant in that case, Navitrans Maritime Co. had induced Western Bulk Carriers KS to enter a contract by representing that it owned the M/V Centauri, which if true would have afforded Western Bulk Carriers the right to arrest the vessel and in any case was sufficient evidence to establish that Western Bulk Carriers arrested the vessel in good faith;

2.    Western Bulk Carriers KS instructed its counsel in Angola to withdraw the arrest proceeding under Case No. 955/05 in Angola but Western Bulk Carriers KS has been prevented from doing so due to the existence of the fines, whose validity Western Bulk Carriers disputes for the aforementioned reasons; and

3.    Should Western Bulk Carriers KS fail to pay the fines imposed by the Angolan Supreme Court it will be further held in contempt of court in case No. 955/05; and

4.    Should Western Bulk Carriers KS fail to pay the fines imposed by the Angolan Supreme Court its Angolan counsel will likewise be held in contempt of court and/or face disciplinary proceedings with the Angolan bar association.