# EXHIBIT ASR 1, PART IV

$^1/_6$

Meríssimo Juiz de Direito da Sala das
Questões Marítimas do Tribunal Provin-
cial de Luanda
Luanda

Proc. 163/05
Apensado

KBC — Western Bulk Carriers K/S. Embargado nos Autos à margem referenciada,
melhor sabido, vem dizer o seguinte:

I

Impugna-se inteiramente os Embargos que adiante se contestará
amiúde.

II

Antes de se explicitarem as razões da improcedência, importa analisar a seguinte

Questão Prévia

III

Os documentos passados em Países Estrangeiros na conformidade da respectiva Lei, fazem
prova como a fariam os documentos da mesma natureza exarados em Angola.

IV

Contudo, para serem validamente aceites, carecem de reconhecimento por parte do
Notário Público, através do Agente Diplomático ou Consular Angolano do respectivo
país, e que a assinatura deste Agente, seja autenticada.

V

Acontece que, os documentos apresentados em língua Estrangeira, devem acompanhar-se
da respectiva tradução

VI

Assim, subjaz à presente, seja o Embargante convidado a suprir as deficiências aqui
sugeridas, sob pena de sanção cominadas por Lei.

VII

Apreciada a Questão Prévia, importa agora explicitar a Total Improcedência dos
Embargos, que se respondem

73

*2/6*

#### VIII

Não corresponde a verdade a alegação, segundo a qual o navio CENTAURI é parte ilegítima no Arresto decretado.

#### IX

Com efeito, a CENTAURI SHIPPING LIMITED proprietária do navio CENTAURI é uma empresa detida entre outros pela KING MARITIME CO. Doc.1

#### X

De igual modo a NAVITRANS MARITIME CO, é uma empresa detida pelo Sr IOANNIS TINGA e EVUENI TINGAS. Doc 2

#### XI

Assim, entre a CENTAURI SHIPPING LIMITED e a NAVITRANS MARITIME CO, o património de uma responde pelas dívidas do outro e vice-versa.

#### XII

Na verdade e nos Termos da Convenção de Bruxelas de 1952, sobre o Arresto de Navios de Mar, de que Angola é parte, são Créditos Marítimos os direitos resultantes de Contratos Relativos a utilização de Navios ou a propriedade dos mesmos, alínea d) do art° 1° da referida Convenção.

#### XIII

Assim, os Créditos Marítimos como previsto nessa Convenção, independentemente da nacionalidade das partes e da sua residência, são causas legais de Arresto de Navio a que o crédito se reporta como de qualquer outro navio pertencente ao devedor, art°3° da Convenção de Bruxelas e art° 402 do C.P.C.

#### XIV

No caso sob judice, são contratos de fretes marítimos futuros e validamente assumidos pelas partes a razão do presente conflito.

#### XV

Nos termos alista do art° 601° do C:C, encontra-se consagrado o Princípio de Responsabilidade Ilimitada do devedor, ao dispor que, o cumprimento da obrigação é assegurada por todos os bens existentes no Património do devedor, mesmo os que tenham sido adquiridos depois da constituição da obrigação.

#### XVI

Assim resulta de forma clara e cristalina que, o navio CENTAURI é parte legítima desta relação jurídico controvertida; pois, o mesmo, tal como a NAVITRANS, como adiante se demonstrará, são detidas pelas mesmas pessoas.

#### XVII

Na verdade e compulsado a Transcrição do Registo da Companhia de Malta, relativamente a propriedade da CENTAURI SHIPPING LIMITED; aparecem como accionistas a KING MARITIME CO.

*74*

... aparece o Senhor IOANNIS TINGAS, como um dos seus Directores.

### XIX

... quisado a Adenda do Contrato de Hipoteca que consta dos Autos, as folhas ... lavrado entre a OMEGA BANK AS, como o mutuário e KING MARITIME ... verificamos.

... TINGAS, aparece a assinar em nome da VENUS SHIPPING LIMITED, como ... Hipoteca.

... EVGENIOS TINGAS ... em nome de KING MARITIME

... IOANNIS TINGAS e isto pela ... Direcção da Marinha Mercante da ... e desta solicit.

... Presidente ...
... Secret ...

... feitos nos Autos, do passados para confirmar a titularidade do ... e a validade destes documentos, resultam de sua própria existência e que ... exactamente se verificado do seu texto, não havendo, como se vê, ...

### XXII

... confirmadas por provas sérias e ... especial e nunca por simples

### XXIII

... descrição de factos sem relação ... com por envolver os factos ... incidentes.

### XXIV

... que são fins se não quem e

### XXV

... expresso CANTALENI SHIPPING LIMITED e NAVITRANS MARITIME ... constituídas em Malta e Libéria, respectivamente.

75

4/6

### XXVII

...tes e Malta, são Paraísos Fiscais, onde os factos constitutivos principais como, accionistas, capitais, não são acessíveis a Terceiros.

### XXVII

Não restam dúvidas que estamos em presença de uma Construção Capsiosa de Empresas e que visam, fundamentalmente esconder a real identidade das propriedades detidas pelos TÂNCIAS para dificultar a correcta identificação por parte dos credores.

### XXVIII

Por isso é que os Paraísos Fiscais são acolhidos como as melhores Praças para acobertar os accionistas, sendo que razão mais do que suficiente para não se juntarem aos Autos os Factos Societários

### XXIX

Conteúdo e nos Termos do art° 343° do C.C., o ónus de fazer prova dos Pactos Societários, compete à Embargante

### XXX

O que o Embargante diz nos artigos, 18° a 21°, dos Embargos é exactamente, aquilo que os ditames da boa Regra de Direito, recomendam.

### XXXI

Contudo, e no caso sub judice, e pelos fundamentos aduzidos, a CENTAURI SHIPPING LIMITED e a NAVITRANS MARITIME CO, ambos agitam como uma só pessoa; visando o inabista

### XXXII

Assim, para o Embargante, o que os outros dizem é "tratatana" e o de boa fé só aquilo que ...prouxe...

### XXXIII

...como fica, abundantemente demonstrado, o incomodada, a inqualificável má fé do ...

### XXXIV

...ante põe em causa a regra de direito afectada, por na sua visão, não ...apreciação ...desta, ...resulta dos autos, a violação, errada ou sub –

### XXXV

...tia se mira ... não é necessária que ...seja provar ... Acordão do STJ, de 13/04/73, BMJ-226,

Republic of Angola
MINISTRY OF JUSTICE
ADMIRALTY COURT OF LUANDA
MARITIME QUESTIONS DIVISION

PROCESS No. 183/05

## SENTENCE No.11

- The Court is competent by reason of nationality, subject matter and hierarchy.

- The parties are the legitimate ones and they are duly represented by their lawyers.

- There is an exception of legal incapacity, which is my duty to decide upon.

The contract in question, a matter of future freights, called "FFAS" as shown at page 9 of the arrest process, was signed without any doubts whatsoever by Western Bulk Carrier K/S and Navitrans, as shown at page 15 of process 182/05, and also at pages 62, 63, 64, 65, 66, 68, 69, 70 of this process.

The object of the same contract is the vessel known as "CENTAURI" and it contains details of the respective characteristics (page 71).

The contract is to prevent significant fluctuations in the freight rates during the contractual periods.

The vessel Centauri is the fundamental object in that process, inasmuch as in document 3B, called Addendum, in its point (2) amendments to the loan contract, the vessel Centauri is included with references to "the vessel III" the Motor Vessel Centauri is thus connected. And the loan, refers to the loan of future freights (FF).

- Invoices for the unpaid rates were likewise addressed to Navitrans, payments owed for August 2004, September 2004, October 2004, November 2004 and December 2004, pages 25 to 29 in the records of the preventive proceeding.

77

I

- And among vessels I, II and III the vessel Centauri is the one subject of the future freights contract. Besides "It is only because of this" that the contract itself was called "FUTURE FREIGHTS". It is addressed to the operation and management of vessels.

And it was thus, within the scope of the same contract that the rates owed for the months of July and August 2004 were paid, but the amounts owed for the September, October, November and December 2004 and for 2005, were not paid.

And, consequently, WBC-Western Bulk Carrier K/S and Navitrans-Marine owner of the vessel Centauri, are legitimate parties in this process.

Without any further discussion, I judge the exception of the legal incapacity of CENTAURI SHIPPING LIMITED in the arrest process, to be unfounded, owing to the following facts:

## FACTS:

## WHEREAS

The fact that Navitrans and WBC Western Bulk Carrier K/S signed an FFA contract (future freights contract) pages 10, entered into as a way of preventing significant fluctuations in freight rates during the contractual periods, has been proved.

The said rates are on record in the document at page 38, and it is seen there how the respective payments operated to begin with and in the sequence of performance of the contract.

Also relevant is the addendum to the contract made on 8 July 2004, which contains all the necessary references, as recorded at pages 48, 49, 50, 51, 52, 53, 54, 55 and 56 of the file.

The defendant in the process (Navitrans), from the rates produced by the BALTIC EXCHANGE, and as agreed, paid the instalments owed for the months of July and August 2004.

If it has nothing to do with the Plaintiff, why did it pay the Bank and within the scope of the said contract?

78

- It is likewise proved that the vessel "CENTAURI" is managed by Navitrans Maritime, (management contract).

Also, that the rate would be the average rate for the contractual period published by the Baltic Exchange until the settlement date.

Also evident from the scope of the contract is that the type of nautical and commercial management is clearly defined, as follows:

"Owners" means the party identified in box 2 (page 63) and in the respective box at page 72, namely: Centauri Shipping Ltda. – Valleta, Malta.

And in the addendum, at point 2.01, paragraph 5, it says Vessel III "the motor vessel Centauri", registered in the guarantor's name, called Centauri Shipping Ltd., with Maltese flag, port of registration Valleta, official number 6842.

Point 8.2 of the same addendum states: "In particular, the parties hereby reaffirm and confirm that each of the loans, A, B and C have to be paid within thirty days in equal and consecutive half-yearly instalments in accordance with clause 3.3 of the loan contract A, B and C (pages 48,49,50 of the file).

Consequently, the legitimate parties in the preliminary process of arrest and in the respective attachments on the motor vessel "Centauri" are WBC Western Bulk Carrier K/S and Navitrans Maritime Inc., which, among other things agreed in the respective contracts a rate of US$ 22,400.00 per day for the year 2004 and US$ 11,500.00 for the year 2005 (pages 15 and 16) of the preliminary process, corresponding to:

US$ 11,171.00 for the month of September
US$ 197,689.58 for the month of October
US$ 234,089.03 for the month of November
US$ 315,744.47 for the month of December

All these invoices are only for the year 2004.

And the Plaintiff thus claims an amount of US$858,674.8 with the relevant interest.

79

· 3

The requirements envisaged in art. 510 and above all in its paragraph e), in conjunction with art. 406 No.2, have been observed, and making a decision:

It is thus seen that art. 762, 782, 798 of the Civil Code have been breached and, consequently, I judge that all the material facts raised by the plaintiff WBC Carriers K/S have been proved.

On these terms I maintain the arrest of the vessel Centauri, unless the defendant should give a suitable guarantee, or pays what it owes, the attached amount of US$ 858,674.47 (eight hundred and fifty-eight thousand six hundred and seventy-four US dollars and forty-seven cents). Costs by the appellant.

Let it be registered and notified.

ADMIRALTY COURT, in Luanda, on the 20th June 2005.

THE PRESIDING JUDGE

Signature – illegible

Dr. Rigoberto Kambovo

*80*

4

Doc 4



REPÚBLICA DE ANGOLA

MINISTÉRIO DA JUSTIÇA
**TRIBUNAL MARÍRITMO DE LUANDA**
**SALA PARA AS QUESTÕES MARÍTIMAS**

**PROCESSO Nº 183/05**

# SENTENÇA Nº 11

- O Tribunal é competente em razão de nacionalidade, matéria e hierarquia.

- As partes são as legítimas e estão devidamente representadas pelos seus causídicos.

- Há excepção de ilegitimidade de que cumpre-me decidir.

O contrato em causa, que é de fretes futuros, denominado "FFA'S" como consta a fls. 9 do processo de arresto, foi celebrado sem dúvidas nenhumas entre Western Bulk Carrier K/S e Navitrans como consta a fls.15 do processo 182/05, e também a fls.62, 63,64,65,66,68,69,70 do presente processo.

O objecto do mesmo contrato é o navio denominado "CENTAURI" e nele estão inclusive descritos as respectivas características (fls.71).

O contrato para prevenir as flutuações significativas nas taxas de fretes durante os períodos contratuais.

O navio Centauri é objectivo fundamental nesse processo porquanto no próprio documento 3 B denominado Adenda no seu ponto (2) emendas ao contrato de empréstimo. nele está incluso o navio Centauri com referencias "o navio III" o navio Motor "Centauri está ai o nexo. E o empréstimo. refere-se aqui ao empréstimo de (FF) fretes futuros.

- Os recibos de cobranças das taxas não pagas foram igualmente dirigidos para a Navitrans, pagamentos devidas de Agosto 2004,

81

1

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Setembro 2004, Outubro 2004, Novembro 2004 e Dezembro 2004. fls.25 a 29 dos autos de procedimento cautelar.

· É sobre os navios I, II e III o navio Centauri de que celebrado o contrato de fretes futuros. Alias " É só por isso" que o próprio contrato se denominou de " FRETES FUTUROS". Destina-se para a exploração e gestão de navios.

E foi assim no âmbito do mesmo contrato que as taxas devidas dos meses de Julho e Agosto de 2004, foram pagas mas não pagou os valores respeitantes as taxas de Setembro, Outubro, Novembro e Dezembro de 2004 e as de 2005.

E portanto só são partes legítimas neste processo a WBC-Western Bulk Carrier K/S e  Navitrans-Marine in proprietário do navio Centauri.

Sem mais julgo improcedente a excepção de ilegitimidade da *CENTAURI SHIPPING LIMITED* no Processo de arresto pelos seguintes factos:

### FACTOS:

### APRECIANDO

Está provado que de facto a Navitrans e a WBC Western Bulk Carrier K/S, celebraram um contrato de FFA'S (contrato de fretes futuras) fls.10 celebrado como meio de prevenção contra as flutuações significativas nas taxas de frete durante os períodos contratuais.

As referidas taxas constam no documento de fls.38 e ali vê-se como funcionava os respectivos pagamentos no início e na sequência do cumprimento do contrato.

Ilustrativo é a adenda ao contrato concluída a 8 de Julho de 2004, que contém todas as referências necessárias como constam a fls.48,49,50,51,52,53,54,55 e 56 dos autos.

· A requerida nos autos (A Navitrans), e a partir das taxas produzidas pelo BALTIC·EXCHANGE), alias como acordado, pagou as taxas devidas aos meses de Julho e Agosto de 2004.

Se nada tem a ver com a Autora, porque pagou aquele Banco e no âmbito no referido contrato??

82

2

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

- Está igualmente provado que o navio "CENTAURI" é gerido pela Navitrans Maritime. (contrato de gestão)

Também, que a taxa de pagamento seria a taxa média do período contratual publicados pelo Baltic Exchange até a data da liquidação.

Também resulta claro que no âmbito do contrato tipo de gestão náutica e comercial vem claro e definido o seguinte:

"Proprietários" significa a parte identificada na caixa 2 (fls.63) e na respectiva caixa que se encontra a fl.72 lê-se: Centauri Shipping ltd· Valleta – Malta.

E na adenda no ponto 2.01 no 5° paragrafo lê-se o Navio III " o navio Motor Centauri", registado em nome do fiador denominado Centauri Shipping Ltd, com bandeira de Malta, Porto de registo, Valleta, com número oficial n°6342.

No ponto 8.2 da mesma adenda consta:" Em particular as partes aqui reafirmaram e confirmaram que cada um dos empréstimos A, B e C têm de ser pagos em trinta dias em iguais e consecutivas parcelas semi·anuais de acordo com a cláusula 3.3 do contrato de mutuo A, B e C (fls.48,49,50 dos autos).

Portanto, partes legítimas no processo de procedimento cautelar de arresto e nos respectivos embargos opostos ao arresto do navio a motor "Centauri" são WBC Western Bulk Carrier K/S e a Navitrans· Maritime inc. que de entre tantos acordavam nos respectivos contratos uma taxa de USD 22.400.00 por dia para o ano de 2004 e USD 11.500.00 para o ano de 2005 (fls.15 e 16) do procedimento cautelar, correspondendo a:

a USD 11.17100 para o mês de Setembro
USD 197.689.58 para o mês de Outubro
USD 234.069.03 para o mês de Novembro
USD 315.744.47 para o mês de Dezembro

Estas todas as facturas correspondem apenas ao ano ano de 2004.

E reclama assim a requerente um valor de USD858.674.8 com respectivos juros.

83                                              3

From: 326301        Page: 10/10    Date: 6/22/2005 11:36:27 AM

Estão preenchidos os requisitos previsto no art°510° e sobretudo na sua al.e) em conjunção com o art°406° n°3, e decidindo;

Verifica-se deste modo a violação do art° 762,782,798° do Código Civil e em consequência julgo provada toda a matéria de facto articulada pela requerente WBC Carriers K/S.

Nestes termos mantenho o arresto do navio Centauri a menos que a requerida preste caução idónea, ou pague o que deve, a embargada a quantia de USD 858.674.47 (oitocentos e cinquentas e oito mil, seiscentos e setenta e quatro dólares norte americanos e quarenta e sete cêntimos.) , Custas pela Embargante.

Registe e Notifique.

-------TRIBUNAL MARÍTIMO, em Luanda, aos 20 de Junho de 2005.

O JUIZ PRESIDENTE

Dr. Rigoberto Kambovo

84

4

TRANSLATION

ANÍBAL ESPÍRITO SANTO
JOSÉ JÚLIO FIGUEIREDO
LAWYERS
Rua Lucrécia Paim, 28/30
Tel – 222395956  Fax -222338011
LUANDA

[stamp: REGISTERED UNDER NO. 224]
Luanda, 1/09/1905[1]
[signed]]

To the Judges and Counsel of the Supreme Court

LUANDA

Considering this appeal against the judgment of 130 folios, drawn up in the appeal
proceedings in which the "Judge a quo", upheld the arrest of the N/M Centauri.

As it did not agree with that decision, which was unfavourable to it as it considered the plea of
lack of right of action alleged in it to be unfounded, CENTAURI SHIPPING LTD, owner of the
vessel CENTAURI, the subject of the provisional arrest measure, decreed in case no. 182/05,
pleaded OPPOSITION to the arrest, under the cover of and pursuant to arts. 405 and 406 of
the Code of Civil Procedure (CCP).

The appeal case is in the form of a summary proceeding: art. 406 no. 3.  Consequently, once
the pronouncements ended, the preparatory hearing was set (folio 92), the record of which
constitutes folios 102 to 103v.

The preparatory hearing, in addition to attempting a settlement, aims "to prepare the decision
on the matters arising out of the pronouncements and which have to be resolved in the
decision accepting the formalities of the right of action" A.R.V.III page 180.

Having read the stated record of the preparatory hearing, it is recorded that the appellant's
agent took a position as to the presumed right of action, reiterated the position that there were
no group relationships between Centauri Shipping and Navitrans, reaffirmed that there was
no "maritime loan" in the light of the 1952 Brussels Convention as a result of the "financial
negotiations" held between NAVITRANS and WESTERN BULK CARRIERSK/S (BULK), on
everything, adding also that there was no reference to the vessel Centauri in any of the FFA'S
contractual documents, which in any case would be irrelevant.

At that hearing, on the substantial and substantive matters, the party appealed against
restricted itself to reiterating its opinion that:
"as to freight futures contracts, their fundamental object is the use of vessels for that reason a
maritime loan par excellence" "sic", folios 103v (our underlining).  It is only through manifest
legal ignorance that it is a futures (freight) contract, as if it were a maritime loan, which
justifies the identification made by the party appealed against in the stated preparatory
hearing.

[1] Do they mean 2005?

85

in addition to ordering the holding of the preparatory hearing, art. 787 of the CCP, which regulates the summary proceedings, instructs the provisions of arts. 510 and 511 to be observed. – In the mean time, it happens that the "judge a quo", now the incumbent of the place, without giving any pertinent reason, decided to hold a new preparatory hearing.

[end of page 1]

New preparatory hearing, because
- Pursuant to art. 508, the preparatory hearing had already taken place (folios 92 and 102 to 103v).

The appellant claimed through a useless action, because it was repetitive and illegal, as there were no grounds in the law of civil procedure in force (folio 125), in an order drawn up on 09/6/2005, the "judge a quo", without deciding about the claim pleaded, instructed the parties to be notified and ordered conclusion for decision (folio 126).

As the "claim" was not accepted by the appellant about the lack of legal grounds for holding the hearing again, decided to find themselves in a position of resolving the case and this was without having held the hearing for that purpose, decided on the plea. Now, if it was necessary to hear the debate on the plea of lack of right of action alleged by Centauri Shipping, it was not perceived that it had been clarified without that debate or then "discovered" that the plea had already been debated, but made a clean sweep of the arguments set out by the parties and registered in the record.

This is how in the decision accepting the formalities of right of action-judgment, it decided, subsequently and furthermore, on the dismissal of the appeal.

It is that decision, resulting from an "emasculated" case, which gave rise to this appeal.

When it complies with the terms of art. 659 of the CCP, no. 1, the judgment is structured in a concise statement of the application and its grounds, the grounds and conclusions of the defence, occurrence of interest in knowledge about the dispute and a precise stipulation of the matters to be resolved.

In accordance with no. 2, the judge will make a critical examination of the evidence and will establish the facts considered proven; then will interpret and apply the law to the facts, concluding with a final decision.

The jurisdictional activity of the judge in this case is directed exclusively at the decision on the legal basis of the arguments presented against the decision to decree the arrest applied for by BULK.

With the appeal Centauri Shipping intended to prove that there were no grounds for the arrest in the light of the 1952 Brussels Convention combined with art. 402 ff. of the CCP.

For that purpose, the right of action was based on a summary of the facts which proved that there were no grounds for the arrest decreed and ends with the application to declare Centauri to have no right of action.

Art. 510 of the CCP (no. 5 above) determines that "having held the preparatory hearing (...) the decision accepting the formalities of right of action is delivered within fifteen days for the following purposes:
a) to find out, by the order designated in art. 288, the pleas which may lead to the merits of the case being acquitted without a decision, as well as the invalidities (...)
b) to decide whether there are grounds for any final plea
c) ...

[end of page 2]

In compliance with art. 510, in the general order for the decision accepting the formalities of right of action, the judge a quo states, amongst others, that "the parties have a right of action and are duly represented by their lawyers", referring to the appeal case – Pr. No. 183/05, and justifies that declaration.

The declaration in general terms in the decision accepting the formalities of right of action is a declaration without grounds.

In terms of right of action, the only problem raised was the lack of right of action alleged by Centauri Shipping.

However, strangely, and before giving a decision on the plea of lack of right of action alleged by Central Shipping, the judge considers, going against the grain that it is a procedural principle to explain for what reason the parties have the right of action.

It Is, therefore, important to analyse the arguments used to declare the right of action of Navitrans, bearing in mind that it is a question of an arrest based on the probability that there was a maritime loan.

The judge justifies the right of action of Navitrans based 1- on the futures contracts and 2- on the (only imagined) ownership of the vessel CENTAURI:

*Therefore, deals with the judgment:*

*"The contract in question, which is for freight futures, (...) was entered into without any doubt between Western Bulk Carrier K/S and Navitrans (folio 130);*
*it is on the vessels I, II and III the vessel Centauri that the freight futures contract was entered into. As a matter of fact "it is only due to that" that the contract itself was called "freight futures" intended for the operation and management of vessels" (folio 131); and within the scope of that contract (...) not paid in amounts relating to the months of September, October, November and December 2004 and of 2005 (folio 131);*
*and therefore only Western Bukl [sic] Carrier and Navitrans Maritime as the owner of the vessel Centauri are legitimate parties in this case.*

87

## THE FREIGHT FUTURES CONTRACT

For the debts arising out of freight futures contracts to be the grounds for the arrest, it was necessary for those contracts to have generated a maritime loan.

This is legally impossible, as has already been proved and is reiterated.

- In the record of the preparatory hearing, the appellant left the nature of the FFA's clear. There were no debts from this which were constituted as maritime loans.
- It is well known, as has been proven by the speculative nature of the contract called FFA, on the one hand, not only that the loans arising out of these did not constitute maritime loans pursuant to the 1952 Convention since they derive from speculative financial contracts – and,

[end of page 3]

Because the alleged maritime loan which the plaintiff is claiming is based on FFA'S, it is important to state that the so-called FFA'S are not maritime contracts:

The FFA'S are speculative financial contracts between individuals, entered into, therefore, outside of the Stock Exchanges (for stocks and shares or for goods) – such as the Baltic Exchange, which is an international trading exchange for coal, wood, oil and cereals, with its headquarters in London, but not contracts for vessels.

And when the judge stated in folio 131 that *"its contract was called "FREIGHT FUTURES" (because) it is intended for the operation and management of vessels,* that statement results from the confusion made between FFA contracts and the Addenda to the Loan Agreement referred to in the Judgment on folios 130 and folios 48 of the Pr 182/05.

As they are financial contracts, they may be entered into between any parties, and the simple fact that, as in the case in point, they were entered into between two "maritime" companies, that does not qualify them as contracts from which loans result which can be subsumed in art. 1, no. 1 of the 1952 Brussels Convention on arrests of seagoing vessels.

- But more importantly than the nature of the organisations which enter into futures contracts is the reason for the contracts.

In the so-called "Futures Contracts" in which FFA's are included, they may intervene in three ways, i.e. with one of three purposes:
Cover of risks; arbitrage; speculation.

It is stated that a decision is subject to RISK when there is a set of results which may arise out of that decision and when known probabilities may be associated with each of the possible results.

In the Economics Dictionary VERBO; Bannock et al., page 375 ..
Also in a more legal perspective, the risk consists of determining who bears the losses resulting from an Act of God or force majeure.

88

Prof. Pessoa Jorge, in Presumptions of Public Liability, page 121.

Now, when the WBC and Navitrans entered into the affreightment contracts for the vessels, they were entered into with fixed prices, therefore, none of the parties were running risks. That rate or fixed price is the rate to be considered for the purposes of the maritime contract.

In terms of contracts for the use of vessels, once the contract is entered into, fluctuations of freight are contractually irrelevant, they have no legal significance, because here too the contracts are to be complied with punctually.

The fixed rates of the affreightment contracts function in the "FFA'S" as a reference for the determination of the amount which, once the term of the contract ends, will be owed by one of the parties to the other.

Therefore, contrary to what the plaintiff is claiming, there are no fluctuations in the freight rates, against which it is protected with the stated contracts, precisely because the rates previously agreed are fixed.

[end of page 4]


ARBITRAGE consists basically of the diversion of funds in the short-term from one investment to another in such a way as to obtain greater gains and without involving risk. (In Economics Dictionary VERBO, Bannock et al, page 28).
It is easy to conclude that there is no movement of funds which allows one to conclude on an exercise of arbitrage.

There remains SPECULATION which consists of the purchase and sale with a view to obtaining profits subsequently, when the prices have changed.

Both BULK and NAVITRANS entered into a contract to speculate with the change in the freight rates on the lines, change in the nature of the stock exchange, therefore unrecognised by the 1952 Brussels Convention. It was precisely what happened with the prices of the FFA'S Contracts from which Navitrans' debts with WBC resulted.

Debts, it is reiterated, resulting from contracts of a financial nature, which are not maritime contracts.

It was precisely a futures, financial contract, which comes completely within the framework of these parameters of *speculation* WESTERN BULK CARRIES K/S [sic] entered into with NAVITRANS MARITIME, and not with CENTAURI SHIPPING.

It was due to the breach of the clauses of the futures (speculative) contracts that WBC (BULK) brought an action against NAVITRANS and only NAVITRANS, in the London court. Doc appended.

The qualification of the futures contracts, the FFA'S as "maritime loans", which the plaintiff BULK alleges as a right of action, constituted an error of law in the form of error of interpretation and application of the law.

89

What is confirmed with the definition of "maritime loans" contained in no. 1 of art. 1 of the Brussels Convention: "means the allegation of a right or of a loan from one of the following reasons": and the Convention does not include loans or rights, which result for their holder in speculative business, in the following seventeen reasons for maritime loans even though the basis or reference of the speculation is a contract for the use of a vessel.

On the interpretation of the concept of "maritime loan", we pay attention to a judgment of a French appeal court and we listen to the analysis of the doctrine of the 1952 Brussels Convention by two acclaimed university professors and famous maritime specialists:

FROM THE AIX-EN-PROVENCE APPEAL COURT (2nd Com. Ch.)
26 October 2001 in the case of the company BAY HARBOUR MANAGEMENT et al. –v- Sté PANTHER MARINE ENTREPRISES Ltd and the purpose of the arrest of the vessel *Canmar Supreme* defended:
That the 1952 International Brussels Convention relating to the unification of certain rules on the arrest of vessels "... *must be interpreted restrictively. Also, if the legislator intended to restrict, with an aim of clarity and international application, cases where a debt had to be considered to be maritime, it is not for the national judge, when interpreting such a convention, to extend the cases stipulated".*

*[end of page 5]*

*(see Le Droit Maritime Français (French Maritime Law) No. 624 – March 2002 – page 265)*

In his comparative analysis of the 1952 Convention on the arrest of vessels with the new Convention (12 March 1999 – which is not in force in Angola) – see *DMF* 1999 No. 403 (p. 407), M.F. Berlingieri highlights that the new Convention maintains the technique of the previous one – criterion of numerus clausus for maritime loans – "mainly because an open list would have caused incalculable uncertainty and would have allowed the courts excessive freedom which is prejudicial to uniformity" (of international law, we specify). The same understanding is supported by this famous teacher in his book "Arrest of Ships" published by Lloyds Law Press.

The stated Convention, of which Angola is a party, marks out a clear definition of what arrest is: "Arrest" means the immobilisation of a vessel, on the authorisation of a competent judiciary authority, as a guarantee for a maritime loan, but does not include the seizure of a vessel based on an enforceable document.

In the same sense, read Professor Vigil Toledo in comparing the provisions of the 1952 Convention on the arrest of vessels with the legislation of the Andean countries (Bolivia, Colombia, Ecuador, Peru and Venezuela) produced on the same line states that these provisions .... "*are in fact exceptions to the general rule of law which stipulates that all the debtor's assets constitute a general pledge over which an embargo may be effected, subject to the exceptions stipulated categorically in law. In this sense, both agreements .... are an exception to the general rule of law insofar as the vessels may be embargoed only for maritime loans specifically indicated in those instruments and may not be embargoed for any*

90

*other loan* ..." ("The preventive embargo of vessels in the Comunidad Andina Anuario de Derecho Maritimo" (Andean Community Yearbook of Maritime Law) VOL XX, page 284).

It is necessary to conclude that the qualification of the futures contracts, the FFA'S, as "maritime loans" which the Plaintiff BULK alleges as a right of action, constitutes an error of law in the form of an error of interpretation and application of the law.

However, because the legality of the arrest has to be justified by the concept of maritime loan, to give grounds for that legality, the judge "decides" that the futures freight contract has as its object the activity of the vessel Centauri.

And because, objectively, the "judge a quo" intends, at all costs, to uphold the arrest, that is only possible by eliminating Centauri Shipping through the fiction of ownership which it is seen to be forced to attribute to NAVITRANS (folio 131) against its own words, also on folio 131.

And as Navitrans is the owner of the arrested vessel, then Centauri Shipping would not have the right of action to intervene through an appeal, because the arrest case is between other parties.

This also makes a clean sweep of the grounds for the right of action of Central Shipping: the ownership of the vessel.

A real unstable balance.

[end of page 6]


And by this untrodden path that the "judge a quo" judges he is able to open the door to the application of art. 3 of the 195 [sic] Brussels Convention which states "any plaintiff may arrest the vessel to which the loan relates, like any other belonging to that party which on the date of the constitution of the maritime loan was the owner of the vessel to which that loan refers.

On the other hand, it is added there is not the merest sign of evidence that these FFA'S even relate to the n/m Centauri.

Condition for which Centauri Shipping Ltd was liable with its assets, the n/m Centauri, is that it was a party to a contract for the use of the vessel and from that resulted any obligation which was not complied with.

The judgment contains a manifest error of judgment because it wrongly assesses the facts, in considering Centauri Shipping as a party to the FFA contract when in fact it is only a party to the management contract entered into with Navitrans Maritime.

*91*

## ON THE RIGHT OF ACTION OF NAVITRANS

It is strange, incomprehensible and in admissible, because there are no legal grounds for qualifying Navitrans as a legitimate party in case 183/05 (appeal), since going through the stated case, there is no representation of Navitrans.

Furthermore, Navitrans is the only legitimate party, as the party petitioned in Pr. No. 182/05 (provisional). The judgment contains an error of judgement because it wrongly assesses the facts. There is an error of law in considering as a party in a case someone who is not represented in it art. 32 no. 1 paragraph a) of the CCP, even more so, Navitrans, as the party petitioned, could have filed a motion or appealed against it. Having not done so, it is not even a party.

Pursuant to art. 668, no. 1 paragraph c) a) the judgment is invalid because it does not specify the grounds of fact and of law for the decision to consider NAVITRANS AS OWNER, since the grounds invoked by the judge, should logically lead to the opposite result of what is seen in the judgment, i.e. to conclude that Navitrans has no right of action in Pr 183/05.

But this conclusion by the judge a quo, on Navitrans' right of action as owner contradicts what the judge himself states on folio 132, where in paragraph 4 it is recognised that the owner is CENTAURI SHIPPING.

As a matter of fact, up to the present date, in this triptych which are the cases relating to the vessel Centauri, no intervention, of any type, by NAVITRANS has been seen.

## ON THE LACK OF RIGHT OF ACTION OF CENTAURI SHIPPING

Then, the judgment states:
"There is a plea of lack of right of action which it is my duty to decide on".
This plea of lack of right of action was actually argued by Centauri Shipping in the appeal case, considering the fact that the vessel Centauri, which it owned, had been arrested.

[end of page 7]

In the decision on the plea the judge a quo avoids analysing the arguments presented by the parties, making his way through the eloquent statements which have nothing to do with the subject. As will be proven.

The order states on folio 131

"Furthermore I judge the plea of lack of right of action of CENTAURI SHIPPING LIMITED in the arrest case to be unfounded due to the following facts:

92

FACTS:
ASSESSING"

To continue, when it would seem that it would go on, with facts, to debate the validity of the facts on which the lack of right of action of CENTAURI SHIPPPING LIMITED was based in the appeal, finally what the judge did was to plead facts from which, avoiding the legal logic, he draws the conclusion, on folio 132:

"Therefore, the legitimate parties in the case for the provisional arrest proceedings and in the respective appeal opposed the arrest of the motor vessel "Centauri" are WBC Western Bulk Carrier K/S and Navitrans Maritime Inc. which between as many (?) they agreed in the respective contracts a rate of USD 22,400.00 per day, for the year 2004 and USD 11,500.00 for the year 2005 (folio 15 of the provisional proceedings)

Now, a rate of Usd 22,400.00 per day, in month with 30 days (September and November) would give USD 672,00.00/month and in months with 31 days (October and December) would give USD 694,400.00/month.
That is, the applicant which is claiming usd 858,674.00 would claim USD 2,732,800.00.

This measure is used to see the confusion the judge a quo makes between what is the maritime contract for the use of the vessel and the FFA'S.

This confusion which arises out of the lack of knowledge of what an FFA is, which is of a speculative nature leads to the fact that the amounts owed for those contracts may be different on each measure
Precisely because their rates are determined by the Baltic Exchange which is a stock exchange unlike a maritime contract in which the contracting parties fix the price; it should be seen that the reference for the FFA'S is the fixed rate of the contracts

Also, the FFA is confused with a loan agreement (folio 132, paragraph 5)

Therefore, and contrary to his statement on folio 133, the judge does not show how "the requirements stipulated in art. 510 are fulfilled and especially in its paragraph e(?) or paragraph c)?

This statement of folio 133 is merely formal, totally devoid of material legal content, especially with reference to paragraph e)? c)? which would require the judge to lay down the critical examination of the evidence to be realised to make it possible to control the process of forming the decision.

Critical examination which the "judge a quo" avoids because the result of that would be that the vessel Centauri is owned by Centauri Shipping (folio 72) which is not the subject of any contract

[end of page 8]

of FFA because these are financial contracts for mere speculation and that the FFA'S contracts are not contracts for the use of vessels, that the maritime contract for the use of a vessel has a fixed rate (doc ....

93

But, above all, it would be clearly shown that the decision accepting the formalities of right of action only served to support the intention to uphold the illegal decision of decree of the arrest.

In not considering the plea made founded, the judge would be obliged to produce in the appeal case the specification and list of questions and the relevant facts would arise in all their clarity and distinctness and since contrary to his statement that it is not proven.

Because in the arrest case, the judge a quo, also, infringed art. 699 of the CCP because he did not state the legal reasons for the decree of the arrest, which are now clearly disclosed in the statement "paid what is owed".

Irregular because it is invalidated by a position totally going against the grain of the law: "paid what is owed" contradicts the legal nature of the right of action in the arrest case: mere probability of the existence of

In defining what the party petitioned (irrespective of who this is) owes to the applicant the amount it is claiming, the judge extracts a conclusive judgment from the probability of the existence of a right, seriously violates the principle of the need for evidence expressed in art. 1 of art. 514 of the CCP.

Furthermore, the judgment states on folio 133:
"This is how the infringement of Art. 762, 782, 798 of the Civil Code occurs and, consequently, I judge all the facts pronounced by the applicant WBC Carriers K/S to be proven.

Now, facts are not proven as there is an infringement of a law; on the contrary, the fact is proven that there may be an infringement of the law.

IN CONCLUSION

In pronouncing the judgment the "judge a quo" did not comply with the legal criteria stipulated in art. 659 and 660, both of the CCP.

It is not proven from the judgment that the futures contracts (FFA's) are contracts from which maritime loans result, since the consideration of the existence of a maritime loan constitutes an error of law through a mistaken interpretation of the applicable law, the 1952 Brussels Convention,.

[end of page 9]

The judgment contains a manifest error of judgement because it wrongly assesses the facts, in considering Centauri Shipping as a party to the FFA contract when, in fact, it is only a party to the management contract entered into with Navitrans Maritime.

94

The judgment contains an error of judgement when, in considering "Navitrans-Marine as the owner of the vessel Centauri" (sic) position which it assumes without any kind or type of grounds, and contradicting the documentary evidence on the ownership of Centauri Shipping Limited, thus infringing art. 668, no. 1 paragraph c).

The judgment contains a very serious and significant error of law in pronouncing in the appeal case a decision on the substantive matter: "… paid what is owed" (sic), a matter which may be decided only in the principal action, on which the arrest case (and at the same time the appeal) is dependent, thereby exceeding the subject of the appeal.

If Centauri Shipping is a party without the right of action, and evidence was not regimented that the N/M Centauri is owned by Navitrans-Maritime Co, the decision violated the provisions of art. 668 no. 1 paragraph b) and the arrest was pronounced illegally, and must be lifted immediately.

The judgment is invalid, pursuant to no. 1, paragraph d) 1. part of art. 668 of the CCP 1st part, it violated the provisions of art. 510 paragraph d) since the judge did not assess the problem raised by the current appellant about the nature of the FFA'S and the impossibility of it being subsumed in the concept of maritime loans as stipulated in no. 1 art of the 1952 Brussels Convention.

Admitting, without granting, the declared right of action of NAVITRANS in the appeal case, that does not necessarily imply that the plea of lack of right of action argued by CENTAURI SHIPPING LTD. is unfounded.

ON THESE TERMS AND ON THE TERMS OF LAW

The plea of lack of right of action argued by CENTAURI SHIPPING LIMITED must be considered founded and proven and accordingly the curative judgment pronounced revoked and the pronouncement of the order to lift the arrest ordered.

If that is not what is intended, the decision accepting the formalities of right of action pronounced must be considered invalid, the assessment of the matter of lack of right of action argued ordered and, if there is insufficient evidence for that to be considered founded leading to the merits of the case of Centauri Shipping and the N/M Centauri being acquitted, the appropriate specification and the list of questions produced for the case to continue.

[end of page 10]

95