# EXHIBIT ASR 1, PART V

TO: Waterson Hicks
ATN: MR Timings

ANÍBAL ESPÍRITO SANTO
JOSÉ JÚLIO FIGUEIREDO
ADVOGADOS
Rua Lucrécia Paim, 28/30
Tel- 222395956 Fax-222335811
LUANDA-

**Excelentíssimos Senhores
Juízes Conselheiros
Tribunal Supremo**

**LUANDA**

Vem o presente recurso da sentença de fls 130, lavrada no processo de embargos na qual, o Sr "juiz a quo", manteve o arresto do N/M Centauri.

Inconformada com esta decisão, que lhe é desfavorável ao considerar improcedente a excepção de ilegitimidade alegada por si alegada, a CENTAURI SHIPPING LTD, proprietária do navio CENTAURI, objecto da medida cautelar de arresto, decretada no processo n.º182/05, deduziu OPOSIÇÃO ao arresto, ao abrigo e nos termos dos art.ºs 405.º e 406º do CPC.

O processo de embargos segue a forma de processo sumário : art.º 405.º n.º3 Consequentemente, findos os articulados, foi marcada audiência preparatória, (fls92), cuja *acta* constitui fls102 a 103vº.

A audiência preparatória, para além da tentativa de conciliação, visa " preparar o julgamento das questões suscitadas nos articulados e que hajam de ser resolvidas no despacho saneador" A.R V. III pg.130.

Lendo a referida acta da audiência preparatória, constata-se que o mandatário da embargante tomou posição quanto ao pressuposto legitimidade, reiterou a posição de inexistência de quaisquer relações de grupo entre a Centauri Shipping e a Navitrans, reafirmou a inexistência de "<u>crédito marítimo</u>" à luz da Convenção de Bruxelas de 1952 como resultado dos "<u>negócios financeiros</u>" realizados entre a NAVITRANS e a WESTERN BULK CARRIERSK/S (BULK) , a(o que) tudo, acrescendo ainda que em nenhum documento contratual dos FFA,S há qualquer referência ao navio Centauri, o que de todo o modo seria irrelevante.

Nessa audiência, de substancial e substantivo, a embargada limitou-se a reiterar a sua opinião de que: -
"quanto aos contratos de fretes futuros o seu objecto fundamental é utilização de navios daí um <u>crédito marítimo</u> por excelência" "sic", fls 103 vº. (*sublinhado nosso*)
**Só por manifesta ignorância jurídica do que seja um contrato (de frete) futuro, como do que seja um crédito marítimo, justifica a identificação feita pela embargada na referida audiência preparatória.**

Para além de ordenar a realização de audiência preparatória, o art 787º do CPC, que regula o processo sumário, manda observar o disposto nos art.º 510.º e 511º. Sucede, entretanto, que o "juiz a quo", agora o titular do lugar, sem dar uma razão não pertinente, decidiu realizar <u>nova audiência preparatória</u>.

96

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Audiência preparatória nova, porque
-Nos termos do art.508.º, a audiência preparatória já se realizara (fls 92 e 102 a 103vº.)

Tendo a embargante reclamado pela prática de um acto inútil, porque repetitivo e ilegal, por não ter qualquer fundamento no direito processual em vigor,(fls125), em despacho lavrado a 09/6/2005, o "juiz a quo", sem decidir sobre a reclamação deduzida, mandou notificar as partes e ordenou conclusão para decisão (fls 126).

Não tendo aceite a "reclamação" da embargante sobre a falta de fundamento jurídico para repetição da audiência, decidiu encontrar-se em condições de resolver o processo E sem que se tivesse realizado a audiência para tal finalidade, decidiu da excepção. Ora, se necessitava ouvir a discussão da excepção de ilegitimidade arguida pela Centauri Shipping, não se percebe que tenha ficado esclarecido sem tal discussão ou então "descobriu" que a excepção já tinha sido discutida, mas fez tábua rasa dos argumentos expendidos pelas partes e registados na acta própria

É assim que no despacho saneador-sentença, decidiu, de seguida e sem mais, da improcedência dos embargos

É desta decisão, resultante de um processo "castrado", que nasceu o presente recurso.

Quando respeite os termos do art.º 659.º do CPC, nº1, a sentença estrutura-se por uma exposição concisa do pedido e seus fundamentos, dos fundamentos e conclusões da defesa, de ocorrências de interesse para o conhecimento do litígio e fixação precisa das questões a resolver.

De acordo com o n.º2, o juiz fará o exame crítico das provas e estabelecerá os factos que considera provados; depois interpretará e aplicará a lei aos factos , concluindo pela decisão final.

A actividade jurisdicional do juiz neste processo dirigia-se exclusivamente à decisão sobre a procedência dos argumentos apresentados contra a decisão de decretamento do arresto requerido pela BULK.

Com os embargos a Centauri Shipping pretendeu demonstrar que o arresto não tem fundamentos face à Convenção de Bruxelas de 1952 conjugada com o art.º 402. e seguintes do CPC.

Alicerçou para o efeito, como causa de pedir, um somatório de factos que demonstram a inexistência de fundamentos para o arresto decretado e termina com o pedido que seja declarada a sua, dela Centauri, ilegitimidade.

-O art.º 510.º do CPC (n.º5 supra) determina que "realizada a audiência preparatória (...) é proferido dentro de quinze dias despacho saneador para os seguintes fins:
a) Conhecer, pela ordem designada no art.º288.º,das excepções que podem conduzir à absolvição da instância, assim como das nulidades (...)
b) Decidir se procede alguma excepção peremptória
c)...

97 2

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Ao cumprir o art.º 510.º, no despacho genérico no saneador, o juiz a quo diz, entre o mais, que "as partes são legítimas e estão devidamente representadas pelos seus causídicos", referindo-se ao processo de embargos-Pr n.º 183/05. e justifica essa declaração.

A declaração em termos genéricos no despacho saneador é uma declaração não fundamentada.

Em termos de legitimidade o único problema que se punha era o da ilegitimidade arguida pela Centauri Shipping.

Contudo, estranhamente, e antes de se pronunciar sobre a excepção de ilegitimidade arguida pela Central Shipping, o juiz vem, ao arrepio do que é princípio processual explicar por que razão as partes são legítimas.

Importa portanto analisar os argumentos utilizados para declarar a legitimidade da Navitrans, tendo presente que se está a tratar de um arresto fundamentado na probabilidade de existência de um crédito marítimo.

O juiz justifica a legitimidade da Navitrans com base 1- nos contratos de futuros e 2- na( apenas imaginada) propriedade do navio CENTAURI:

*Para tanto, reza a sentença:*

***"O contrato em causa, que é de fretes de futuros,(...) foi celebrado sem dúvidas nenhumas entre a Western bulk Carrier K/S e Navitrans,(fls 130);- é sobre os navios I,II,e III o navio Centauri de que celebrado o contrato de fretes futuros. Aliás "É só por isso" que o próprio contrato se denominou de "Fretes Futuros" destina-se para a exploração e gestão de navios"( fls 131); e no âmbito do mesmo contrato(...) não pagou os valores respeitantes aos meses de Setembro, Outubro, Novembro e dezembro de 2004 e os de 2005.(fls 131); e portanto só são partes legítimas neste processo a Western Bukl Carrier e Navitrans Maritime la proprietária do navio Centauri.***

***DO CONTRATO DE FRETES FUTUROS***

Para que as dívidas resultantes de contratos de fretes futuros fossem fundamento de arresto era necessário que tais contratos tivessem gerado um crédito marítimo.

O que é juridicamente impossível, como já se demonstrou e vai reiterar.

-Na acta da audiência preparatória, a embargante deixou clara a natureza dos FFA's, questão Destes não resultam dívidas que se constituam em créditos marítimos.
-É notório, como se demonstrou pela natureza especulativa do contrato denominado FFA que por um lado, não só os créditos deles nascidos não constituem créditos marítimos nos termos da Convenção de 1952-pois derivam de contratos financeiros especulativos- como,

98

3

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Porque o pretenso crédito marítimo que a A. reclama se funda nos FFA'S importa dizer que os chamados **FFA'S não são contratos marítimos :**

**Os FFA'S são contratos financeiros especulativos entre particulares**, celebrados por conseguinte, fora das Bolsas ( de valores ou de mercadorias)-tal como o Baltic Exchange, que é uma Bolsa de comércio internacional de carvão, madeira, óleos e cereais, sediada em Londres, mas não de contratos de navios.

**E quando o juiz diz a fls 131,que** *"o próprio contrato se denominou de "FRETES FUTUROS".(porque) Destina-se para a exploração e gestão de navios,* **essa afirmação resulta da confusão** que fez entre contratos de FFA e a Adenda ao Contrato de Mútuo(LoanAgreement) referido na Sentença a fls 130 e a fls 48 do Pr 182/05.

**Como contratos financeiros que são, podem ser celebrados entre quaisquer interessados, e o simples facto de, como no caso em apreço, terem sido celebrados entre duas empresas " marítimas", isso não os qualifica como contratos de que resultem créditos subsumíveis ao art.º 1, nº1 da Convenção de Bruxelas de 1952 . sobre arrestos de navios do mar.**

-Mas mais importante do que a natureza das entidades que celebram contratos de futuros é a causa dos contratos.

Nos chamados "Contratos de Futuros" em que se incluem os FFA'S, pode-se intervir por três vias, i.e., com uma de três finalidades:
Cobertura de Riscos; Arbitragem;Especulação.

Diz-se que uma decisão está sujeita a **RISCO** quando há um conjunto de resultados que podem surgir dessa decisão e quando se pode associar probabilidades conhecidas a cada um dos resultados possíveis.
*In* Dicionário de Economia VERBO ; Bannock e outros, pg. 375.
Também numa perspectiva mais jurídica, o risco consiste na determinação de quem suporta os prejuízos resultantes dum caso fortuito ou de força maior.
Prof. Pessoa Jorge, *in* Pressupostos da responsabilidade civil, pg 121

Ora, quando a WBC e a Navitrans celebraram os contratos do fretamento dos navios celebraram-nos com preços fixos, portanto nenhuma das partes ficou a correr riscos.
Essa taxa ou preço fixo, é a taxa a considerar para efeito do contrato marítimo.

Em termos de contratos de utilização de navios, celebrado o contrato as flutuações dos fretes são contratualmente irrelevantes, nada significam juridicamente, porque também aqui os contratos são para serem pontualmente cumpridos.

As taxas fixas dos contratos de fretamento, funcionam nos "FFA'S" como referência para determinação do valor que, findo o prazo contratual, será devido por uma das partes à outra.

Portanto ao contrário do que pretende a A. não há flutuações nas taxas de fretes, contra as quais se proteja com os referidos contratos, justamente porque as taxas previamente acordadas são fixas.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

A ARBITRAGEM consiste básicamente no desvio de fundos a curto prazo, de um investimento para outro de modo a obter maiores ganhos e sem envolver risco.
(*In* Dicionário de Economia VERBO, Bannock e outros, pg 28.)
<u>E fácil concluir que não há qualquer movimento de fundos que permita concluir por uma exercício de arbitragem.</u>

<u>Resta a **ESPECULAÇÃO** que consiste na compra e venda com vista à obtenção de lucros posteriores, quando os preços se tiverem alterado.</u>

Tanto a BULK como a NAVITRANS contrataram para especular com a variação das taxas dos fretes nas linhas, variação de natureza bolsista, portanto desconhecida da Convenção de Bruxelas de 1952. Foi justamente o que se passou com os preços dos Contratos FFA'S dos quais resultaram as dívidas da Navitrans para com a WBC.

Dívidas, reitera-se, resultantes de contratos de natureza financeira, que não são contratos marítimos.

Foi justamente um contrato de futuros, financeiro, perfeitamente enquadrável nestes parâmetros da *especulação* que a WESTERN BULK CARRIES K/S celebrou com a NAVITRANS MARITIME, e não com a CENTAURI SHIPPING..

E foi por incumprimento das cláusulas dos contratos de futuros (especulativos) que a WBC (BULK) accionou a NAVITRANS e só a NAVITRANS, no tribunal de Londres.
Doc anexo

**A qualificação dos contratos de futuros, os FFA'S como "créditos marítimos" que a A. BULK, alega como causa de pedir, constitui-se em erro de direito na forma de erro de interpretação e aplicação da lei.**

O que se comprova com a definição de **"créditos marítimos"** constante no nº 1 do art.1.º da **Convenção de Bruxelas** : " significa a alegação de um direito ou de um crédito proveniente de uma das causas seguintes"; e dessas seguintes dezassete causas de créditos marítimos, **a Convenção não inclui os créditos ou direitos que resultam para o seu titular, de negócios especulativos, ainda que a base ou referência da especulação seja um contrato de utilização de navio.**

Sobre a interpretação do conceito de "crédito marítimo" atentemos uma sentença de um tribunal de recurso francês e ouçamos a análise doutrinária da Convenção de Bruxelas de 1952 por dois consagrados Professores universitários e ilustres maritimistas:

DA COUR D'APPEL D'AIX-EN-PROVENCE (2e Ch. com.)
26 Outubro de 2001 no caso da sociedade BAY HARBOUR MANAGEMENT et a. c/ Sté PANTHER MARINE ENTREPRISES Ltd e a propósito do arresto do navio *Cannar Supreme* defendeu :
Que a Convenção Internacional de Bruxelas de 1952 relativa à Unificação de certas regras em matéria de arresto de navios « ... ***doit être interprétée restrictivement. Aussi, si le législateur a entendu limiter, dans un but de clarté et d'application internationale, les cas où une créance devait être considérée comme maritime, il n'appartient pas au juge national, lorsqu'il interprète une telle convention, d'étendre les cas prévus*** ».

5

100

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: unknown Page: 9/13 Date: 9/8/2005 2:34:40 PM
06-09-05 13:52 002442358261 LINCE SERVIÇOS ->222332581 BCM Pag. 09

*( vidé Le Droit Maritime Français Nº 624- Março de 2002 -, pág 265 )*
M. F. Berlingieri na sua análise comparativa da Convenção de 1952 sobre arresto de navios com a nova Convenção ( 12 de Março de 1999- que não está em vigor em Angola ) –vidé *DMF* 1999, Nº 403, (p. 407)destaca que a nova Convenção mantém a técnica da anterior -critério do numerus clausus para os créditos marítimos - « principalmente por que uma lista aberta teria causado uma incerteza incalculável e teria deixado aos tribunais uma liberdade excessiva o que é prejudicial á uniformidade » ( (do direito internacional , precisamos nós) O mesmo entendimento sustenta esse ilustre mestre no seu livro «Arrest of Ships » -publicado pela Lloyds Law Press .

A referida Convenção , de que Angola é parte traça uma definição clara do que é o arresto : Arresto" significa a imobilização de um navio, mediante autorização de autoridade judiciária competente, em garantia de um crédito marítimo, mas não compreende a apreensão de um navio baseada em título exequível.

No mesmo sentido vide o professor Vigil Toledo ao comparar as disposições da Convenção de 1952 sobre o arresto de navios com a legislação dos países andinos ( Bolívia , Colombia, Equador, Perú e Venezuela ) elaborada na mesma linha assinala que tais disposições ...." *son en la realidad , excepciones a la regla general de derecho que estipula que todos os los bienes del deudor constituyen prenda general sobre la qual puede hacerse efectivo un embargo, salvo las excepciones taxativamente señaladas en la ley. En este sentido, ambos convenios ........son excepción a la regla general de derecho en la medida en que* ***las buques solo pueden ser embargados por créditos marítimos especificamente indicados en dichos instrumentos y no pueden ser embargados por ningún otro crédito.*** " ( El embargo preventivo de buques en la Comunidad Andina Anuario de Derecho Marítimo VOL XX , pág. 284 )

É forçoso concluir que a qualificação dos contratos de futuros, os FFA'S, como "créditos marítimos"que a Autora BULK, alega como causa de pedir, constitui-se em erro de direito na forma de erro de interpretação e aplicação da lei.

Mas porque tem que justificar a legalidade do arresto pelo conceito de crédito marítimo, para fundamentar essa legalidade, o juiz "decide " que o contrato de frete futuro tem por objecto a actividade do navio Centauri.

E porque, objectivamente,o "juiz a quo" pretende, a todo o transe, manter o arresto isso só é possível eliminando a Centauri Shipping pela ficção de propriedade que se vê forçado a atribuir à NAVITRANS, (fls 131) contra as suas próprias palavras,igualmente a fls 131.

É que sendo a Navitrans a proprietária do navio arrestado, então a Centauri Shipping não teria legitimidade para intervir por embargos, porque o processo de arresto era entre outras partes.

Faz-se assim, tábua rasa do fundamento da legitimidade da Central Shipping: a propriedadedo navio.

Verdadeiro equilíbrio instável

6

101

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

É por este caminho ínvio que o" juiz a quo" julga poder abrir a porta à aplicação do art.° 3.°da Convenção de Bruxelas de 195 ,que diz "qualquer autor pode arrestar o navio a que o crédito se reporta, como qualquer outro pertencente àquele que na data da constituição do crédito marítimo era proprietário do navio a que este crédito se refere.

Acresce, por outro lado, não há o mais simples indício de prova de que tais FFA'S respeitassem sequer ao n/m Centauri
Condição para que a Centauri Shipping Ltd respondesse com aquele seu património, o n/m Centauri, é que a mesma fosse parte de um contrato de utilização de navio e dele lhe resultasse qualquer obrigação que não tivesse cumprido

A sentença contém um manifesto erro de juízo porque aprecia erradamente os factos, ao considerar como parte do contrato FFA a Centauri Shipping quando esta, na realidade é apenas parte no Contrato de gestão celebrado com a Navitrans Maritime

DA LEGITIMIDADE DA NAVITRANS

É estranha ,incompreensível e inadmissível, porque juridicamente infundada, a qualificação da Navitrans como parte legítima no processo 183/05( embargos), porquanto, percorrendo o referido processo, não se vê nele qualquer representação da Navitrans Mgis.

A Navitrans só é parte legítima, enquanto requerida, no Pr. n.° 182/05 ( cautelar).
A sentença contém um erro de juízo porque aprecia erradamente os factos.
Há erro de direito ao considerar parte num processo quem não se fez representar no mesmo art.° 32.°n.° 1 al.a) deCPC, muito embora a Navitrans, enquanto requerida, pudesse ter agravado ou embargado. Não o tendo feito nem sequer é parte.

Nos termos do art. 668.°n°1,al.c)a) a sentença é nula porque não especifica os fundamentos de facto e de direito para a decisão de considerar a NAVITRANS IN PROPRIETÁRIO, pois os fundamentos invocados pelo juiz, deveriam logicamente conduzir ao resultado oposto ao que vem na sentença,i.e., concluir pela ilegitimidade da Navitrans no Pr 183/05.

**Mas esta conclusão pelo juiz a quo, da legitimidade da Navitrans <u>in proprietário</u> contradiz o que o próprio juiz diz a fls 132, onde no parágrafo 4.° se reconhece que proprietário é a CENTAURI SHIPPING.**

Aliás, até à presente data, neste tríptico que são os processos relativos ao navio Centauri, não se viu ainda qualquer intervenção, de qualquer tipo, da NAVITRNAS.

DA ILEGITIMIDADE DA CENTAURI SHIPPING

Seguidamente, diz a sentença :
"<u>Há excepção de ilegitimidade que nos cumpre decidir</u>".
Esta excepção de ilegitimidade foi efectivamente arguida pela Centauri Shipping no processo de embargos, considerando o facto de ter sido arrestado o navio Centauri, de sua propriedade.

7

102

Na decisão sobre a excepção o juiz a quo foge da análise dos argumentos apresentados pelas partes, para se embrenhar em elocubrações que nada têm a ver com a matéria. Como se provará.

**Diz o despacho, a fls 131**

"Sem mais julgo improcedente a excepção de ilegitimidade da CENTAURI SHIPPING LIMITED no Processo de arresto pelos seguintes factos:

FACTOS :
APRECIANDO "

A seguir, quando parecería que iria, com factos, discutir a validade dos factos em que nos embargos se alicerçava a ilegitimidade da CENTAURI SHIPPING, LIMITED, afinal o que o juiz faz é deduzir factos com os quais, fugindo á lógica jurídica, tira a conclusão, a fls 132:
"Portanto, partes legítimas no processo de procedimento cautelar de arresto e nos respectivos embargos opostos ao arresto do navio a motor "Centauri" são WBC Western Bulk Carrier K/S e a Navitrans Maritime Inc. que de entre tantos (?) acordaram nos respectivos contratos uma taxa de USD 22.400.00 por dia para o ano de 2004 e USD 11.500.00 para o ano de 2005 (fls 15 do procedimento cautelar)

Ora, uma taxa de Usd 22.400.00 por dia, nos meses de 30 dias ( Setembro e Novembro) daria USD 672.000.00/mês e nos meses de 31 dias ( Outubro e Dezembro) daria USD 694.400.00/mês.
Ou seja, a requerente que reclama usd 858.674,00, reclamaria USD 2.732.800,00.

Este passo serve para se ver a confusão que o juiz a quo faz entre o que é contrato maítimo de utilização de navio e os FFA'S.

Esta confusão que nasce do desconhecimento do que seja um FFA, cuja natureza especulativa leva a que possam ser diferentes a cada passo os valores devidos por tais contratos.
Justamente porque as suas taxas são determinadas pelo Baltic Exchange que é uma Bolsa, diversamente de um contrato marítimo em que são os contratantes quem fixa o preço: veja-se que a referência dos FFA'S é a taxa fixa dos contratos

Igualmente, confunde o FFA com um contrato de máfretamento (fls 132, parágrafo 5.º)

Portanto, e contrariamente á sua afirmação de fls 133, o juiz não mostra como "estão preenchidos os requisitos previstos no art.º 410 e sobretudo na sua al.e(?) ou al.e)?

Esta afirmação de fls 133 é meramente formal, totalmente vazia de conteúdo jurídico material, em especial a referência à al.e)? c)? cuja concretização exigiria que o juiz fizesse o exame crítico das provas, *para possibilitar o controlo do processo de formação da decisão.*

Exame crítico a que o "juiz a quo" foge porque dele resultaria que o navio Centauri é de propriedade da Centauri Shipping(fls 72), que não foram objecto de nenhum contrato

8

103

<u>de FFA porque estes são contratos financeiros de mera especulação e que o contratos Ffa'S não são contratos de utilização de navios, que o contrato marítimo de utilização de navio tinham uma bota fina (doc ...</u>

Mas acima de tudo isso , **resultaria claro** que o **despacho saneador apenas servia para suportar a intenção de manter a decisão ilegal de decretamento do arresto.**

**O juiz, a não considerar procedente a excepção deduzida, seria obrigado a elaborar no processo de embargos especificação e questionário e os factos relevantes surgiriam em toda a sua clareza e nitidez, porquanto e contrariamente á sua afirmação não se prova**

<u>Porque no processo de arresto, o juiz a quo, igualmente, infringiu o art. 699.° do CPC porque não indicou as razões jurídicas do decretamento do arresto, o que vem agora a ser claramente revelado na expressão " pague o que deve".</u>

<u>Irregular porque viciado por uma posição totalmente ao arrepio do direito: "pague o que deve", contraria a natureza jurídica da causa de pedir no processo de arresto; mera probabilidade de existência de</u>

<u>Ao definir que a requerida (qualquer que ela seja) deve à requerente o valor que esta reclama, o juiz extrai um juízo conclusivo a partir da probabilidade de existência de um direito, ofende gravemente o princípio da necessidade de prova expresso no art.°1 do art.°514.° da CPC.</u>

**<u>Mais diz a sentença, a fls 133:</u>**

**"Verifica-se deste modo a violação do Art.° 762, 782, 798° do Código Civil e em consequência julgo provada toda a matéria de facto articulada pela requerente WBC Carriers K/S.**

Ora, factos não se provam por haver violação de uma lei.; pelo contrário provando-se o facto é que pode haver violação da lei

**-EM CONCLUSÃO.**

Na prolação da sentença o "juiz a quo" não obedeceu aos critérios legais previstos nos art.° 659.° e 660.°, ambos do CPC.

Da sentença não resulta provado que os contratos futuros (FFA'S) são contratos de que resultam créditos marítimos, pelo que a consideração da existência de crédito marítimo constitui erro de direito por interpretação errada da lei aplicável, a Convenção de Bruxelas de 1952,.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

A sentença contém um manifesto erro de juízo porque aprecia erradamente os factos, ao considerar como parte do contrato FFA a Centauri Shipping quando esta, na realidade, é apenas parte no Contrato de gestão celebrado com a Navitrans Marítime

-A sentença contém um erro de juízo quando ao considerar a "Navitrans-Marine in proprietário do navio Centauri "(sic)posição que assume sem qualquer espécie ou tipo de fundamentação, e contrariando a prova documental da propriedade da Centauri Shipping Limited., asim infringindo o art.º 668, nº1 al.c)

-A sentença contém um gravíssimo e significativo erro de direito ao proferir no processo de embargos decisão sobre matéria substantiva : "...pague o que deve" (sic), matéria que apenas pode ser decidida na acção principal, de que o processo de arresto( e concomitantemente os embargos) é dependência, assim ultrapassando o objecto do recurso.

-Se a Centauri Shipping é parte ilegítima, e não foi arregimentada prova de que o N/M Centauri é propriedade da Navitrans-Maritime Co, a decisão ofendeu o disposto no art.º668.º nº1, al.b)e o arresto foi proferido ilegalmente, devendo ser imediatamente levantado

A sentença é nula, nos termos do n.º1,al.d) 1.ª parte do art.º 668.º do CPC. 1.ª parte, ofendeu o disposto no art 510n.º al. d ) porquanto o juiz não apreciou o problema posto pela ora embargante sobre a natureza dos FFA's e a impossibilidade da sua subsunção ao conceito de créditos marítimos como conceituados pelo n.º 1 art. Da Convenção de Bruxelas de 1952

Admitindo, sem conceder, a declarada legitimidade da NAVITRANS no processo de embargos, tal não implica, necessariamente a improced-encia da excepção de ilegitimidade arguida pela CENTAURI SHIPPING LTD.

**-NESTES TERMOS E NOS MAIS DE DIREITO**

Deve considerar-se procedente e provada a excepção de ilegitimidade arguida por CENTAURI SHIPPING LIMITED, e em conformidade deve ser revogado o saneador sentença proferido e ordenada a prolação de despacho que ordene o levantamento do arresto

- Se assim se não entender deve ser considerada nulo o despacho saneador proferido, ordenada a apreciação da questão da ilegitimidade arguida e se não houver elementos suficientes para que a mesma seja considerada procedente conduzindo à absolvição da instância da Centauri Shipping e do N/M Centauri, elabore-se a devida especificação e questionário, para prosseguimento dos autos.

40

105

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

JUDGMENT

PROCEEDING No. 955/05

IN THE CIVIL AND ADMINISTRATIVE CHAMBER OF THE SUPREME COURT, THEY AGREED, IN CONFERENCE, IN THE NAME OF THE PEOPLE:

IN THE MARITIME MATTERS DIVISION OF THE PROVINCIAL COURT OF LUANDA, CENTURI SHIPPING LIMITED – VALLETA, MALTA brought third party proceedings by an embargo on the arrest decided in favour of WBC – WESTERN BULK CARRIERS subject to an embargo

The party imposing the embargo maintains its claim invoking in summary that:

It is the owner of the arrested vessel since it entered into with "Navitrans-Maritime Inc" only the nautical and commercial management contract relating to the arrested vessel.

The party subject to the embargo was fully aware that the vessel Centauri belonged to Centauri Chiping [sic] Limited, in stating that the same vessel is owned by Navitrans, it consciously omitted the truth.

The "FFA" freight futures contract entered into by Bulk and Navitrans at no time indicated the vessel Centauri as an asset capable of arrest in the case of any breach of the contract. Admitting that FFAS contracts had been entered into with reference to the vessel CENTAURI, it is important to analyse, in the light of the contract attached to the records, which powers were conferred on the manager.
The Judge which gave in its learned Judgment did not state for what reason the FFAS contract was binding on the arrested vessel.
The party subject to the embargo at no time presented any evidence that the debts contracted referred to the management of the vessel Centauri.

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

The only contract attached to folio 16 refers to the contract for future sales, dated 06 January 2004 in which the parties are Western Bulk Carriers K/S, now party subject to the embargo and purchaser and Navitrans-Maritime as seller.

The party imposing the embargo did not expose any documents, proving both the requirement of existence of probability of the credit and a legitimate fear of losing the ability to raise credit and the existence of a mortgage as a guarantee of obligation nor did it plead facts indicating that the assets of Western Bulk was at risk.

Ends by applying for:

1) The party subject to the embargo to be ordered to pay compensation for the losses suffered at the minimum value of US Dollars 519,000.00.
2) The party subject to the embargo to be ordered to pay any losses and damages to the cargo intended for the port of Borna [?] calculated at the amount in USD of 300,000.00
3) Fine for malicious abuse of legal process.

The party subject to the embargo was notified on folio 19 and entered third party proceedings invoking in summary:

That Navitrans Maritime Co. is a company owned by Sr Joannis Tingas and Evgeni Tingas, then the assets of Centauri Shipping Limited are liable for the debts of Navitrans Maritime and vice-versa.
That pursuant to the Brussels Convention irrespective of the nationality of the parties and their residence, there are legal reasons for the arrest of the vessel to which the claim relates and that of any other vessel belonging to the debtor,

That pursuant to the Brussels Convention of 1952, on arrests of sea-going vessels, to which Angola is a party, maritime claims are rights arising out of contracts relating to the use of vessels or their ownership.

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

That having made it compulsory to transcribe the record of the Companhia de Malta, relating to the ownership of Centauri Shipping Limited there appeared as shareholders: KING MARTIME CO. AND JOANNIS TINGAS as directors. Doc. Folio 26.

In the addendum to the mortgage contract it is recorded that it was entered into between the lender MEGA BANK and borrower KING MARTIME CO. and in the same contract JOANNIS TINGAS signed as guarantors.

Centauri Shipping Limited and Navitrans Maritime Co. acted as a single person in relation to the stratagem.

It concluded by applying for the lack of grounds for the embargo, maintaining the arrest decreed.

As to the application for compensation made by the party imposing the embargo, it is applied that this be set taking into account the total list of damages caused, the degree of culpability of the official, his financial situation and other circumstances worthy of consideration.

Having held the preparatory hearing, the parties did not reach an agreement on the matter disputed.

Then the Judge in the case at the phase of consolidation and condensing, knew the merits of the case, maintaining the arrest already decreed.

In disagreement with the decision on folio 130, the party imposing the embargo appealed for it to be admitted with suspensive effect.

Also in the court a quo the appellant presented its learned and exhaustive pleadings as seen on folios , invoking in summary that:

Centauri Shipping owner of the vessel Centauri is a third party relating to the contracts entered into by NAVITRANS, as manager of the vessel, in no way is it permitted to include clauses in

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

the contract, such matters in the arrest of the management contract entered into between both parties.

The party imposing the embargo took a position as to the assumption of substantive legitimacy, reiterating that there was no group relationship between Centauri Shipping and Navitrans and Western Bulk Carrier.

With the embargo it claimed it was proving that there were no grounds for the arrest in view of The Brussels Convention of 1952 and in the light of the law on proceedings.

"FFAS" futures contracts are speculative financial contracts between individuals entered into outside the stock exchange since no debts result from them nor do not constitute maritime claims pursuant to the 1952 Convention due to the speculative nature of the contract.

Both Navitrans and Bulk entered into a contract to speculate with the variations in freight rates in the lines, these variations of a stock exchange nature are not known in the 1952 Brussels Convention.

The debt results from financial contracts and not from maritime contracts.

It was due to a breach of the clauses of the speculative financial futures contracts that WBC took action against Navitrans Maritime and not Centauri Shipping.

From the addenda to the Loan Agreement for the management and operation of the vessel there were no claims which can be subsumed into the 1952 Brussels Convention on arrests of sea-going vessels.

According to that convention, maritime claims irrespective of the nationality of the parties and their residence are legal reasons for the arrest of the vessel to which the claim relates like any other vessel belonging to the debtor (art. 3 of the convention).

It concluded by applying for acceptance of the grounds of the plea of illegitimacy of Centauri Shipping, ordering the production of the consolidating order.

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

PREVIOUS MATTER

At this instance the party subject to the embargo on folio 206 applied for notification to present counter-pleadings.

The application now made is upheld, invoking for that purpose that:

It became aware at the registry of this instance that the records had a period of time for the legal conditions because there is no certificate in the records proving their notification to present counter-pleadings.

However it occurs that having made records compulsory, it is recorded that on folio 186 the party subject to the embargo was properly notified of the period of ten days for counter-pleadings.

As the period was granted and because the action was not shown to be carried out, the Judge in the case gave the order on folio 186 considering the period for presentation of that procedural document precluded.

According to the current legal theory defended by João Castro Mendes page 135 *P. Civil III If any of the parties applies for examination for the pleadings in the court "a quo" and does not plead, the possibility of pleading in the higher court is lost.*

Thus, we can conclude by saying that only the party subject to the embargo, did not have any reason for making a petition since the absence of counter-pleadings only had to be attributed.

On these terms, the fine of Kz. 10,000.00 is applied for the anomalous incident pursuant to art. 38 no. 3 of the Code of Court Costs.

DECIDING

In the case in question, it important to decide in the first place the legal relationship between Centauri Shipping and Navitrans and Western Bulk Carrier, then secondly to give a decision on the arrest carried out.

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

On 21 January 2002, the nautical management and commercial contract was entered into between Centauri Shipping Ltd, owner of the vessel and Navitrans Maritime Inc. as the manager of that vessel. Folio 62.

Subsequently, another contract called freight futures FFAS was entered into between Navitrans Maritime Inc and Western Bulk Carrier, with offices in Norway, with the aim of protecting against any significant fluctuations in freight rates during the contractual periods, relating to the months of July, August, October, and December of the year 2004, with Navitrans Maritime taking on the obligation to make payments on 30 July 2004, 31 August 2004, 30 September 2004, 30 November 2004 and December 2004, of 7004 [sic].

Still within the validity of the same contract due to a breach by Navitrans Maritime Inc, Western Bulk Carrier proceeded with collection of the invoices corresponding to the months of September to December totalling in USD 858674.08(doc. Folio 20).

In the mean time on 8 July 2004, the addendum was completed and another contract entered into between Omega Bank S.A. bank corporation established in the light of the laws of the Republic of Greece, appointed as lender and borrowers King Martine, Admiral Navigation Limited, Venus Shipping Limited, and Centauri Shipping Limited (folios 48 to 57 of the Precautionary measure).

In the same addendum, requested additional guarantee from the borrowers – with the aim of protecting probable debts that is timely nonfulfilment of the obligations taken on, these in turn offered as the guarantee of the ability to raise credit the following assets:
I – Vessel II motor: "ADMIRAL" registered as owned by the guarantor named Admiral Navigation Limited under the flag of the Marshall Islands

III

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

2 – Vessel II the motor vessel "VENUS" registered as owned by the guarantor Called Venus Shopping [sic] Limited under the Maltese flag.

3 – Vessel III the motor vessel "CENTAURI" registered in the name of the guarantor called Centauri Shipping Limited, under the Maltese flag (folio 48 57 Precautionary measure)

In the case *sub judice* we can immediately highlight the existence of three separate and independent legal relationships.

Whereas in the first legal relationship we have in one of the relationship poles as lender the bank Western Bulk Carriers and borrower Navitrans Maritime, the contract had as its scope "FFAS" freight futures, however the parties did not agree the special guarantees for obligation.

In the second legal relationship there are the active and passive subjects respectively Centauri Shipping Ltd and Navitrans Maritime, having as the object of the contract the nautical and commercial management of the vessel Centauri, under the Maltese flag also omitted as to the guarantee of the obligation.

Finally, there exists the third legal relationship in which the contracting parties assume as contracting parties the bank institution called Omega Bank established in the Republic of Greece in the active pole and as the counterpart in the passive pole the contracting parties King Martime, Admiral Navigation Limited, Venus Shipping Limited, Centauri Shipping Limited.

In the contract just referred to, the parties protecting any breaches awarded as a special guarantee of the obligations the following assets:

Vessel I motor "ADMIRAL", Vessel II motor "VENUS", Vessel III motor "CENTAURI".

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

In view of the facts just stated to be considered, we can conclude that it is a case of very separate legal relationships with very separate subjects, objects and guarantees.

Another without even checking the records that the document called the addendum to the loan contract offering the vessel Centauri as the guarantee refers only to the loan contract entered into between Omega Banc C.I. bank institutions completely separate from Western Carrier also bank institution with which Navitrans C.O. entered into the FFAS freight futures contract.

From the evidence brought to the records, the appellee did not prove that the vessel Centauri with registration no. 286 of 200 is actually owned by Navitrans Maritime, it was transformed into a guarantee for debts which related to it folio 26 since the documents set out on folios 21 to 31 did not contain any reference to that vessel and that the vessel arrested was the object of the contract entered into between Western Bulk Carrier and Navitrans.

Here the question is raised of knowing whether Western Carrier could indicate the vessel CENTAURI owned by Centauri Shipping as being arrested for a debt contracted by NAVITRANS in the freight futures contract?

In the field of civil law, it is said that a person has legitimacy to carry out certain actions when it is the passive or active subject in the legal situation over which the stated actions will exercise their effect, or when it has a legal document which allows it to release legal effects in another legal environment Ana Prata *"Dicionario Juridico"* (legal dictionary) page 606.

In that direction too, we find the thinking of Carlos Mota Pinto in *"Teoria Geral do Direito Civil"* (General Theory of Civil Law) page 256. According to which in principle there is legitimacy for a specific business for subjects whose interests are modelled in the business and there will be a lack of legitimacy whenever it is claimed to derive legal effects from a business, rights, taking on obligations, binding on other persons, who have not

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

intervened in the business, giving rise to the legal sanction of invalidity or cancellability.

If we restrict ourselves to the addendum concluded on 8 July 2004 between Omega Bank S.A., bank corporation established in the light of the laws of the Republic of Greece appointed as lender and borrowers King Martine, Admiral Navigation Limited, Venus Shipping Limited, and Centauri Shipping Limited (folios 48 to 57 of the precautionary measure) offering amongst others the vessel Centauri as one of the guarantees, we find that there is no legal relationship between Centauri Shipping and Navitrans and Western Bulk Carrier.

From the same document, we can also infer that Centauri Shipping, owner of the vessel Centauri, is a third party relating to the contracts entered into between NAVITRANS, as manager of the vessel arrested and Western Carrier.

In the case of separate legal relationships with very distinct subjects, objects and guarantees and because Navitrans was not a subject in the legal relationship binding the arrested vessel, Western Carrier had no unsuitable document, did not have any legal document, allowing the practice of any legal action likely to be binding on Centauri Shipping.

Contained as a general principle of the obligations that the assets of the debtor are liable for its debts (art. 601 no.1 of the Civil Code) the creditor which has a legitimate fear of losing its ability to raise credit for its claim is allowed to apply for the arrest of the debtor's assets pursuant to the law of proceedings.

The creditor also has the right to apply for the arrest against the purchaser of the debtor's assets. Art. 619 nos 1,2 of the Code of Civil Procedure.

From the legal stipulations referred to above, it is possible to learn that the legislator designed as a general rule of guarantee of obligations which are seized, arrested or executed in principle only

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

the debtor's assets, since the admissibility of seizure of the assets of third parties only in the cases expressly indicated by the legislator.

Thus, we can conclude that in fact the party subject to the embargo did not have substantive legitimacy.

The party subject to an embargo in a precautionary measure attached to folios 48 to 50 addenda of a contract offering the vessel Centauri as mortgage where the parties, object of the contract in some way are similar to the parties, the object and guarantees of the material relationship disputed in the precautionary measure.

The deliberate attachment of the stated document is shown to be intentional since it aimed to mislead the Court a quo

On these terms, the party subject to the embargo is ordered to pay a fine of Kz 24,000.00 (twenty-four thousand kwanzas) for malicious abuse of legal process.

As to the compensation as it is shown to be illiquid, the value to be awarded must be fixed in enforcement of the judgment.

In conclusion, we can state that deciding as it was decided did not go well for the Court a quo.

DECISION

On these terms and grounds, it was agreed [illegible]

1 - To revoke the decision appealed against [illegible],

2 - To order the [illegible] of the vessel arrested under official no. 6842

3 – To order the appellee to pay compensation to the appellant to be fixed in the enforcement of the judgment.

4 – To order the appellee to pay a fine for malicious abuse of legal process in the amount of Kzas 450,000.00 (four hundred and fifty thousand kwanzas).

5 – Costs for the appellee with [illegible] Kz 85,000 (eighty-five thousand kwanzas)

Luanda 17/11/2006 (signed)

SUPREME COURT
CIVIL AND ADMINISTRATIVE CHAMBER

CERTIFICATE

I hereby certify that this photocopy which consists of ten folios of regular paper conforms perfectly to the original a quo it was taken and that for the relevant purposes it can be taken as being valid as a certificate of judgment and is duly signed and authenticated with the while seal in use in our Chamber.

Luanda, 21 November 2005
(signed)
[The [illegible] Secretary]



REPÚBLICA DE ANGOLA

Tribunal Supremo

ACÓRDÃO

PROCESSO Nº [illegible]

NA CÂMARA DO CÍVEL E ADMINISTRATIVO DO TRIBUNAL SUPREMO, ACORDAM, EM CONFERÊNCIA, EM NOME DO POVO:

NA SALA DAS QUESTÕES MARÍTIMAS DO TRIBUNAL PROVINCIAL DE LUANDA, CENTURI SHIPPING LIMITED, VALLETA, MALTA deduziu oposição por embargos ao arresto decretado a favor da embargada WBC – WESTERN BULK CARRIERS.

O embargante sustenta a sua pretensão [illegible] que [illegible] do navio arrestado [illegible] com a Navimar [illegible] foi apenas o contrato de gestão náutica e comercial sobre o navio arrestado.

A embargada tinha perfeito conhecimento de que o navio Centauri pertence à Centauri Chipping Limited, ao afirmar que o mesmo navio é propriedade da Navimar faltou conscientemente à verdade.

Os contratos de Frete [illegible] celebrados entre a [illegible] e a Navimar em momento algum indicam o navio Centauri como bem susceptível ao arresto em caso de eventual incumprimento do contrato. Admitindo que os contratos de FFAS tivessem sido celebrados com referência ao navio CENTAURI importa [illegible] nos outros quais os poderes conferidos ao gestor;

O Mmo Juiz a quo na sua douta sentença não diz por que razão [illegible] de FFAS [illegible] navio arrestado.

A embargada em momento algum apresentou qualquer prova de que as dívidas contraídas visavam a gestão do navio Centauri.



REPÚBLICA DE ANGOLA

*Tribunal Supremo*

O único [illegible] junto a fls. 16 refere-se ao contrato de [illegible] [illegible] de 06 de Janeiro de 2004 em que são partes a Western Bulk Carriers K/S, [illegible] e a Navimar Marítima como vendedora.

A embargada não [illegible] quaisquer documentos [illegible] o requisito da existência de probabilidade do crédito como o do justo receio de perda da garantia patrimonial bem como a existência de uma [illegible] como garantia da [illegible], nem [illegible] [illegible] que o [illegible] da Western Bulk se encontrava em [illegible].

Terminou requerendo:

1) A condenação da embargada no pagamento de indemnização pelos prejuízos [illegible] no valor mínimo em USD de 519.000,00.

2) A condenação da embargada por eventuais perdas e danos verificados [illegible] destinada ao [illegible] calculada no mínimo em USD de 300.000,00.

3) [illegible]

Notificada a embargada a fls. 19, deduziu oposição [illegible] em [illegible]:

Que a Navimar Marítima Co. é uma empresa [illegible] [illegible] [illegible], dai que o património da [illegible] Limited responde pelas dívidas da Navimar Marítima [illegible].

Que nos termos da Convenção de Bruxelas, independentemente da nacionalidade das partes e da sua residência são [illegible] de navio a que o crédito respeita como o de qualquer outro [illegible] pertencente ao devedor. [illegible] 3 da convenção; art. 402 do [illegible].

Ver art. 661 do C.Civil.

Que nos termos da Convenção de Bruxelas de 1952, sobre arrestos de navios de mar, de que Angola faz parte, são créditos [illegible] os direitos resultantes de contratos relativos à utilização de navios [illegible] propriedade dos [illegible].




REPÚBLICA DE ANGOLA

*Tribunal Supremo*

Que consultada a transcrição do registo da Companhia de Malta relativamente à propriedade de Centauri Shipping Limited aparecem como accionistas KING MARITIME CO. E IOANNIS TINGAS como directores. Doc. fls. 56.
No âmbito do Contrato de hipoteca consta que foi celebrado entre a [illegible] OMEGA BANK e os armadores KING MARITIME e [illegible] mesmo contrato aparecem como fiadores IOANNIS TINGAS.
A Centauri Shipping Limited e a Horizons Maritime Co. [illegible] como [illegible] pessoa visando o [illegible].
Conclui requerendo a improcedência dos embargos mantendo-se o arresto decretado.
Quanto ao pedido de indemnização formulado pela embargante [illegible] que seja fixada tendo em conta a relação total dos danos sofridos, o grau de culpabilidade do agente, a sua situação económica e demais circunstâncias atendíveis.

Realizada audiência preparatória, as partes não lograram acordo sobre a questão controvertida.

Em seguida o Mmo Juiz da causa já na fase do saneamento e condensação conheceu do mérito da causa, mantendo o arresto já decretado.

Inconformado com a decisão de fls. 139 embargada veio recorrer que foi admitido com efeito suspensivo.

Ainda no tribunal a quo apelante apresentou as suas alegações e contra-alegações como se vê a fls. , invocando em síntese que:
A Centauri Shipping proprietária do navio [illegible] é terceira relativamente aos contratos celebrados pela NAVITRANS enquanto [illegible] do navio, de modo algum lhe é permitido incluir [illegible]



214

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

contrato, estas feitas ao abrigo do contrato de gestão celebrado entre ambas.

A contrário temos posição quanto ao [illegible] da legitimidade substantiva, referindo a inexistência de qualquer relação de grupo entre a Centauri Shipping e a Navimar e a Western Bulk Carrier.

Com os embargos pretendia demonstrar que o arresto não tinha fundamento face à Convenção de Bruxelas de 1952 bem como à luz da lei do processo.

Os contratos futuros " FFA'S " são contratos financeiros especulativos entre particulares celebrados fora da bolsa de valores, pelo que destes não resultam dívidas nem constituem créditos marítimos nos termos da convenção de 1952 devido à natureza especulativa do contrato.

Tanto a Navimar como a Bulk contrataram para especular com as variações das taxas dos fretes nas linhas, variações essas de natureza [illegible] desconhecidas da convenção de Bruxelas de 1952.

A dívida resulta de contratos financeiros e não de contratos marítimos;

Foi por incumprimento das cláusulas dos contratos financeiros de futuros ( especulativos ) que a WBC accionou a Navimar Marítima e não a Centauri Shipping.

Da mesma sorte do contrato de [illegible] ( Loan Agreement) destinado à gestão e exploração do navio, não resultaram créditos subsumíveis à Convenção de Bruxelas de 1952 sobre arresto de navios de mar.

Segundo esta convenção os créditos marítimos independentemente da nacionalidade das partes e da sua residência são causas legais de arresto do navio a que o crédito se refere como qualquer outro navio pertencente ao devedor ( art. 3 da convenção).

Conclui requerendo procedência da excepção de ilegitimidade da Centauri Shipping, ordenando a revogação do despacho [illegible].

120



REPÚBLICA DE ANGOLA

*Tribunal Supremo*

**QUESTÃO PRÉVIA.**

Nesta instância o embargado a fls. 206 veio requerer a notificação para apresentar as contra-alegações.

Sustentou o pedido em [illegible], invocando para o efeito que:

Tendo conhecimento junto da secção desta instância de que os autos corriam prazo para os vistos legais, porém, inexiste nos autos certidão provando a sua notificação para apresentar as contra-alegações.

Acontece porém que compulsados os autos constata-se que a fls. 180 foi o embargado regularmente notificado com o prazo de oito dias contra alegar.

Findo prazo concedido e porque o seu não se apresentou, o Mmo Juiz da causa, e bem, proferiu o despacho de fls. 180 v considerando precludido o prazo de apresentação daquela peça processual.

Segundo a corrente doutrinal defendida por João Castro Mendes pág. 155 P. Civil III, *se alguma das partes renunciar a contra alegações no tribunal " a quo " e não alegar perde a possibilidade de alegar no tribunal de recurso.*

Assim podemos concluir dizendo que ao embargado, não assiste qualquer razão no peticionado pois que a ausência das contra alegações só a si deve ser imputada.

Nestes termos vai condenado o mesmo em Kz. 10.000,00 pelo incidente anómalo nos termos do art.º 58 nº1 do Cod. Custas Judiciais.

DECIDINDO.

No caso em apreço importa decidir em primeiro lugar a relação jurídica entre a Cemmah Shipping e a Navimar e a Western Bulk Carriers, para em seguida nos pronunciarmos sobre o arresto efectuado.



24

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

Em 21 de Janeiro de 2002 foi celebrado o contrato de gestão náutica e comercial entre a Centauri Shipping Ltd, proprietária do navio e a Navitrans Maritime Inc. na veste de gestora do mesmo navio. Fls 62.
Posteriormente foi celebrado um outro o contrato denominado de fretes futuros FFA'S entre a Navitrans Maritime Inc e a Western Bulk Carrier, com sede na Noruega, , visando acautelar eventuais diminuições significativas nas taxas de fretes durante os períodos contratuais relativos aos meses de Julho, Agosto, Outubro, e Dezembro do ano de 2004 , tendo a Navitrans Maritime assumido a obrigação de efectuar os pagamentos em 30 de Julho de 20004, 31 de Agosto de 2004, 30 de Setembro de 2004, 30 de Novembro de 2004 e Dezembro de 2004, de 2004.

Ainda na vigência do mesmo contrato, por incumprimento da Navitrans Maritime Inc a Western Bulk Carrier procedeu à cobrança das facturas correspondentes aos meses de Setembro à Dezembro totalizando em USD 858674,08 ( doc. fls 201
Entretanto em 8 de Julho de 2004 foi concedido à recorrida e um outro contrato celebrado entre Omega Bank S.A. companhia bancária estabelecida à luz das leis da República da Grécia designada como financiador , e mutuários King Marine, Admiral Navigation Limited , Venus Shipping Limited, e Centauri Shipping Limited ( fls 627 da pen. Cam) .

Nessa mesma ocasião solicitada garantia adicional aos mutuários , visando acautelar prováveis déficits ou seja o não cumprimento integral das obrigações assumidas, estes por seu turno ofereceram como garantia patrimonial os seguintes bens:

1- Navio 1 de motor, "ADMIRAL" registado como propriedade do fiador denominado Admiral Navigation Limited com bandeira das Ilhas Marshall.

 

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

2- Navio II o navio de motor "VENUS", registado como propriedade do fiador denominado Venus Shipping Limited de bandeira de Malta.

3-Navio III o navio motor " CENTAURI " registado em nome do fiador denominado Centauri Shipping Limited, com bandeira de Malta.(Fls. 48 a 57 Prov. Caut)

No caso sub judice podemos destacar de imediato a existência de três relações jurídicas distintas e independentes.

Enquanto que na 1ª relação jurídica temos num dos pólos da relação como mutuante o banco Western Bulk Carriers e mutuária a Navimaris Maritime, o contrato tinha como escopo frete "FFAS", todavia as partes não acordaram as garantias especiais para obrigação.

Na 2ª relação Jurídica figuram como sujeitos activo e passivo respectivamente a Centauri Shipping Ltd e Navimaris Maritime, tendo como objecto do contrato a gestão náutica e comercial do navio centauri, com a bandeira de Malta também omisso quanto à garantia da obrigação.

Finalmente constatamos a 3ª relação jurídica em que são contraentes figurando como contraentes a instituição bancária designada por Omega Bank estabelecida na República da Grécia no pólo activo e em contrapartida no pólo passivo os contraentes King Maritime, Admiral Navigation Limited, Venus Shipping Limited, Centauri Shipping Limited

No contrato acabado de referir as partes acautelando eventuais incumprimentos atribuíram como garantia especial das obrigações os bens seguintes:

Navio I de motor, "ADMIRAL", Navio II o de motor "VENUS", Navio III o de motor " CENTAURI "

311

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

Face a factualidade acabada de expender podemos concluir tratar-se de relações jurídicas bem distintas com sujeitos, objectos e garantias bem distintas.

Outro sim verifica-se ainda dos presentes autos que o documento determinado atende ao contrato de mútuo oferecendo o navio Centauri como a garantia refere-se unicamente ao contrato de mútuo celebrado entre a Omega Bank CI instituição bancária completamente alheia da Western Carrier também instituição bancária com quem a Navitrans C.O celebrou o contrato de Fins fretes futuros.

Das provas carreadas aos autos a apelada não provou de que o navio Centauri com matrícula n.º 286 do ano de 200 6 que efectivamente propriedade da Navitrans Maritime, foi transformado em garantia por dívidas que lhe dizem respeito fls. 36, já que os documentos arrolados de fls.21 e fls. e 31 não contém alguma referência do mesmo navio, e que o navio arrestado foi objecto do contrato celebrado entre a Western Bulk Carrier e a Navitrans.

Aqui coloca-se a questão de sabermos se a Western Carrier podia indicar o navio CENTAURI propriedade da Centauri Shipping como tem-se arrestado por dívida contraída pela NAVITRANS no contrato de fretes futuros?

No campo do direito civil, diz-se que uma pessoa tem legitimidade para praticar certo acto quando é sujeito passivo ou activo da situação jurídica sobre a qual o referido acto vai exercer o seu efeito, ou quando tem dado jurídico que lhe permite desencadear efeitos jurídicos em esfera jurídica alheia. Ana Prata *Dicionário Jurídico* pag 606.

Nesta senda também encontramos o pensamento de Carlos Mota Pinto in *Teoria Geral do Direito Civil*, Pag. 256 Segundo o qual em princípio têm legitimidade para um certo negócio os sujeitos dos interesses cuja modelação é visada pelo negócio e haverá carência de legitimidade sempre que se pretenda fazer derivar dum negócio jurídico efeitos, direitos, assunção de obrigações, que vinculem outras pessoas que não.



REPÚBLICA DE ANGOLA

*Tribunal Supremo*

intervieram no negócio, dando origem à sanção jurídica de nulidade ou anulabilidade.

Se nos atermos à adenda concluída a 8 de Julho de 2004 entre Omega Bank S.A, corporação bancária estabelecida à luz das leis da República da Grécia designada como mutuante, e mutuários King Marlins, Admiral Navigation Limited , Venus Shipping Limited, e Centauri Shipping Limited ( fls48,a 57 da Prov. Cautl) oferecendo, entre outros bens o navio Centauri como uma das garantias, vamos verificar que no caso inexiste qualquer relação jurídica entre a Centauri Shipping e a Navitrans e a Western Bulk Carrier.

Do mesmo documento podemos também inferir que a Centauri Shipping, proprietária do navio centauri, é terceira relativamente aos contratos celebrados entre a NAVITRANS, enquanto gestora do navio arrestado e o Western Carrier.

Tratando-se de relações jurídicas distintas com sujeitos, objectos e garantias bem distintas e porquanto a Navitrans não foi sujeito na relação jurídica que vinculou o navio arrestado, a Western Carrier não detinha documento idóneo, não dispunha de algum título jurídico, permitindo a prática de qualquer acto jurídico susceptível de vincular a Centauri shipping.

Consagrado como princípio geral das obrigações de que os bens do devedor respondem pelas suas dívidas,( art. 601-n°1 do C. Civil ), é permitido ao credor que tenha justo receio de perder a garantia patrimonial do seu crédito poder requerer o arresto dos bens do devedor, nos termos da lei de processo.

O credor tem ainda o direito de requerir o arresto contra o adquirente dos bens do devedor, Art.º 619 nos 1,2. do C.P.Civil.

Dos preceitos legais atrás referidos é possível apercebermos de que o legislador concebeu como regra geral de garantia das obrigações que sejam, apreendidos, arrestados ou executados em garantia apenas os

0

125



22

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

bens do devedor, já que admissibilidade de apreensão de bens de terceiros só nos casos expressamente indicados pelo legislador.

Assim podemos concluir que de facto o embargado não tinha legitimidade substantiva.

O embargado na providência cautela juntou a fls. 48 a 50 [illegible] de um contrato oferecendo o navio [illegible] como hipoteca onde as partes, objecto do contrato de modo algum se assemelham com as partes, o objecto e garantia da relação material controvertida na providência cautelar.

A junção deliberada do referido documento mostra-se intencional porquanto visou induzir o Tribunal a quo em erro.

Nestes termos vai o embargado condenado na multa em Kz 24.000,00 (vinte e quatro mil kwanzas) por litigante de má fé.

Quanto à indemnização por se mostrar líquido o valor a atribuir deve ser fixado em execução de sentença.

Em remate podemos dizer que decidir como se decidiu mal andou o tribunal a quo.

DECISÃO:

Nestes termos e fundamentos, acordam os deste Colectivo em:

1- Revogar a decisão recorrida, concedendo provimento ao recurso.

2- Ordenar o levantamento [illegible] [illegible] [illegible] [illegible]

126

3 - Condenar o apelante em [illegible] o apelante que seja [illegible] em [illegible] [illegible]

4 - Condenar apelante em [illegible] [illegible] R$ 50.000,00 ([illegible])

5 - [illegible] apelante [illegible] [illegible] R$ 85.000,00 ([illegible])

[illegible] [illegible]/[illegible]/[illegible]

[signature]

TRIBUNAL SUPREMO
CÂMARA DO CÍVEL E ADMINISTRATIVO
C E R T I D Ã O

Certifico e dou fé que, a presente fotocópia que vai [illegible] em [illegible] folhas de papel [illegible], está [illegible] harmonia com o original, da qual foi [illegible] e que para os efeitos [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] nesta Câmara.

[illegible], 21 de Novembro de [illegible]

[illegible]

TRANSLATION

TO THE VENERABLE JUDGES OF THE SUPREME COURT

LUANDA

Record no. 955/05

WBC – Western Bulk Carrier K/S, with offices in Oslo, Norway, better identified in the documents quoted in the margin.

Pursuant to art. 201 of the Code of Civil Procedure, is challenging the invalidity of the Judgment in the above proceeding, due to omission of action stipulated in law which is required.

For that purpose, the parties benefit, through the rule of the free right to plead in the Court applied to, that is before the appeal is sent to the higher Court (art. 99 no. 1 or in the Court of appeal, that is after sending the appeal (art. 705).

From the principle of freedom contained in these two articles, it is concluded that they will be able to plead in the Court appealed to or only the Appellant, with the Appellee pleading in the higher Court, or only the Appellee, reversing the normal order of presentation of the pleadings, or both and then having to comply with the provisions of art. 705.

As the party is claiming to plead in the Court appealed to, it must present to that Court the petition for presenting an appeal, on which the order of a grant or dismissal will be based, Art. 687, no. 3, 4.

If the order is a grant, the proceeding will be for the account in order for the costs to be calculated , the appellant then being notified to make a deposit.

Once deposited, the parties have two days to apply for examination of the proceeding for pleading, the lawyer may, at the same time, also apply for the trust of the proceeding, in order to examine it in the office – art. 173 and 169.

If, however, having requested examination for pleadings, the party fails to attach them within the period set for this, the right to plead is lost, even in the higher Court – art. 705 no. 1

In the case sub judice, there are no records of any petition of the Appellee to request examination of the proceeding to plead and consequently the application for trust therefore for that purpose, thereby contradicting what is stated in the judgment.

For that purpose the duty of counter-pleading in the Court appealed to must result from an express application, including the examination of the proceeding. As no application for this has been made, the Court appealed to may not supply this statement of truth, then the Court "a quo" it is considered and although the pleadings might be presented to the Court "a quem", because it is repeated there is no application for this in the records.

Thus, the Appellee considers that it did not exercise its right to counter-plead and as a result of its own Certificate produced by the undersigned, the Appellee was not notified to have a court decision communicated, because it was not the duty of the Court "a quo" to do so, subject to having been applied to for this. As that is the case, there is no reason to conclude that there was a claim of an essential formality in the action which generates the consequent invalidity of the judgment, in accordance with the provisions of art. 201 of the C.P.C.

As referred to above, the procedural action is, in essence, a formal action, that is, it is subject to a form of conclusion or establishment laid down in law, to be valid.

And, as shown above, as there was no petition to plead to the Court appealed to, essential formalities in law for the counter-pleadings were postponed, which clearly prejudiced making an organised and adequate defence by the Appellee and as a clear prejudice, that is irreparable, of its rights of defence.

Now,

Now there are no doubts that the final reason for counter-pleading is to reject on the grounds for the appeal which is why it is obvious that it cannot refrain from having the maximum [illegible] and require greater mention.

The counter-pleading is simply, the most relevant action for the purposes of implementing the principle of the adversary system, without which there is no transparency and guarantee of defence.

The Courts must not stop being demanding when examining the conditions for counter-pleadings, not in terms of formalism for the sake of formalism, but in the essential perspective of its final reasons, to give effective and full knowledge of its reasons, so that it can exercise its right of defence in full.

In the best form of law, w will have to apply for the Judgment in the above proceeding to be considered invalid.

(signed)
The Lawyer
Dr Samuel Mendes Mateus
Card No. 452

AO
VENERANDOS JUIZES CONSELHEIROS
DO TRIBUNAL SUPREMO.

LUANDA

Proc. n.º [illegible]

WBC – Western Bulk Carrier K/S, com sede em Oslo, Noruega, melhor identificada nos autos à margem cotada.

Vem nos termos do art. 201 do C.P.C, arguir a nulidade do acórdão do processo supra, por omissão de acto prescrito na lei, o que se requer.

Com efeito, as partes gozam, por via da regra, da faculdade de alegar ou no Tribunal recorrido ou seja, antes de o recurso ser expedido para o Tribunal superior, (art. 698 n.º 1 ou no Tribunal de recurso, isto é depois da expedição do recurso (art. 705).

Do princípio da liberdade consagrado nestes dois artigos, conclui-se mesmo poderem alegar no Tribunal recorrido só o Apelante, alegando o apelado no Tribunal superior, ou só o Apelado, invertendo-se assim a ordem normal de apresentação das Alegações, [illegible] a haver cuidado com observar o disposto no art. 705.

Pretendendo a parte alegar no Tribunal recorrido, deve apresentar nesse Tribunal o requerimento de interposição do recurso, sobre o qual recaíra despacho de deferimento ou indeferimento. Art. 687 n.º 3, 4.

Se o despacho for de deferimento, irá o processo à conta a fim de serem apurados as custas, sendo em seguida notificado o recorrente para as depositar.

Uma vez depositado, têm as partes dois dias para requerer exame do processo para alegação, podendo o Advogado, ao mesmo tempo, requerer também a confiança do processo, a fim de o examinar no escritório – art. 173º e 169º.

Se no prazo requerido exame para alegações, a parte as não juntar no prazo que lhe haja sido fixado, perde o direito de alegar, mesmo no Tribunal superior – art. [illegible]

No caso sub judice, não consta dos autos qualquer requerimento do Apelado a pedir exame do processo para alegar e consequentemente o pedido de confiança do mesmo para esse fim, contrariando-se deste modo o que se diz no acórdão.

Com efeito o dever de contra – alegar no Tribunal recorrido, deve resultar de um pedido expresso, incluindo o exame do processo. Não tendo havido pedido nesse sentido, não pode o Tribunal recorrido suprir esta manifestação de vontade, daí que o Tribunal "a quo" considerou e bem que as Alegações poderiam ser apresentadas no Tribunal "ad quem", porque repetimos, não existe nos autos o pedido nesse sentido.

Assim o Apelado considerou que não exerceu o seu direito de Contra – Alegar e como resulta da própria Certidão elaborada pela escrivã, o Apelante não foi notificado para ser comunicado de uma decisão judicial, até porque não competia ao Tribunal "a quo" fazê-lo, salvo se lhe tivesse sido pedido. Assim sendo não há como não concluir que houve preterição de uma formalidade essencial do acto que gera a consequente nulidade do acórdão, de harmonia do disposto no art. 201 do C.P.C.

Como acima referido, o acto processual é, por essência, um acto formal ou seja, está sujeito a uma forma de celebração e de efectivação legalmente prescrita, para que seja válido.

E como acima ficou demonstrado, não tendo havido requerimento para alegar no Tribunal recorrido, foram preteridas formalidades essenciais da lei para o acto de Contra – Alegar o que prejudicou claramente a realização de uma defesa organizada e adequada por parte do Apelado e em claro prejuízo, aliás irreparável, dos seus direitos de defesa.

Ora,

Ora não existem quaisquer dúvidas que a causa final da Contra – Alegação é impugnar os fundamentos do recurso, pelo que é evidente que não pode deixar de revestir das mesmas cautelas e de exigir a maior atenção.

A Contra – Alegação é, simplesmente, o acto mais relevante para efeitos de realização do princípio do contraditório, sem o qual não há transparência e garantias de defesa. Pelo que,

Os Tribunais não devem deixar de ser exigentes na averiguação do condicionalismo da Contra – Alegação, não em termos de formalismo por formalismo, mas na perspectiva essencial da sua razão final, do conhecimento efectivo e pleno às suas razões, para que aquele possa exercer o seu direito de defesa na sua plenitude.

Termos em que e nos melhores de direito vem requerer que seja considerado nulo o Acórdão do processo supra, com o que se fará a

Acostumada Justiça.

O Advogado

Dr. Samuel Mendes Mateus
Céd. n.º [illegible]

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

CLAIM

PROCEEDING No. 955/06

IN THE CIVIL AND ADMINISTRATIVE CHAMBER OF THE SUPREME COURT, IT WAS AGREED IN CONFERENCE, IN THE NAME OF THE PEOPLE:

Having notified the decision based on the judgment on folios 211 to 220, an appeal was lodged to make a claim (folios 229 to 231) on the following grounds:

That the party benefits through the rule of law from the free right to plead in the court appealed to or in the higher court.

That it did not exercise its right to counter-plead then there was the omission of an essential legal formality which generates the invalidity of the judgment.

Ends by applying for the judgment entered to be declared invalid.

DECIDING

From the records, we can check that the agent of today's plaintiff was personally and properly notified on folio 201 to make payment for preparation for the judgment and that it did so without the above-mentioned omission.

If we are facing a secondary invalidity, the plaintiff has a period of five days to raise a plea pursuant to no. 1 of art. 205 of the *Code of Civil Procedure*, and the person raising a plea is not permitted preclusion of the right to plead that invalidity.

[emblem]

REPUBLIC OF ANGOLA

*Supreme Court*

In no way could the plaintiff enter the stipulations of art. 688 since the facts now pleaded could not be subsumed into the rule stated above.

Moreover, we would point out that the records, in addition to being proven that it is a case of completely distinct legal relationships with well-identified object subjects and guarantees, it was also proven that NAVITRANS owner of the vessel arrested was not a party to the disputed legal relationship, then in no way could the vessel Centauri be arrested, in that way, we have to conclude that presenting counter-pleadings would in no way contribute anything new to the records likely to change the decision given.

The arguments referred to by the plaintiff are fallacious and aim only to delay the useful effect of the decision, thence the claim is deprived of any support, either in fact, or legal.

DECISION:

[hand-written text:
On these terms and grounds, it was agreed [illegible]:

- Deny the claim proceeding relating to the judgment appealed to
- Costs for the plaintiff [illegible]

Luanda, 20/11/07
(signed)



212

REPÚBLICA DE ANGOLA

*Tribunal Supremo*

RECLAMAÇÃO

PROCESSO Nº 955/06

NA CÂMARA DO CÍVEL E ADMINISTRATIVO DO TRIBUNAL SUPREMO, ACORDAM, EM CONFERÊNCIA, EM NOME DO POVO:

Notificado da decisão tomada sobre o acórdão de fls. 211 a 220, veio dela o agravado deduzir reclamação (fls. 229 a 231) com os seguintes fundamentos:

> Que a parte goza por via da regra do direito de livre faculdade de alegar no tribunal recorrido ou no tribunal superior;
>
> Que não exerceu o seu direito de contra alegar daí que houve a preterição de uma formalidade legal essencial que gera a nulidade do acórdão.

Termina requerendo que seja declarado nulo o acórdão proferido.

DECIDINDO.

Dos autos podemos verificar que o ilustre mandatário do ora reclamante foi pessoal e regularmente notificado a fls. 201 para efectuar o pagamento do preparo para julgamento o que fez sem para tal ter suscitado tal [illegible].

No caso estamos perante uma nulidade secundária, tendo o reclamante o prazo de cinco dias para a suscitar nos termos do nº 1 do art. 205º do C. P. Civil, e não a suscitando permitiu a preclusão do direito de arguir tal nulidade.



REPÚBLICA DE ANGOLA

*Tribunal Supremo*

De modo algum o reclamante podia lançar mão ao estabelecido no art. 688º porquanto os factos em alegados não são subsumíveis à norma atrás citada.

Outrossim temos a destacar que dos autos para além de ficado provado tratar-se de relações jurídicas completamente distintas, com sujeitos objectos e garantias bem identificados, também ficou provado que a NAVITRANS proprietária do navio arrestado não foi parte na relação jurídica controvertida, daí que de modo algum podia ser arrestado o navio Centauri, deste modo, somos a concluir que apresentadas as demais alegações em nada vêm trazer de novo aos autos susceptível a alterar a decisão proferida.

Os argumentos aduzidos pelo reclamante são falaciosos e visam apenas retardar o efeito útil da decisão, daí que a reclamação se apresenta destituída de qualquer sustentáculo, quer de facto, quer legal.

DECISÃO:

Nestes termos e fundamentos [illegible]

— Negar provimento à reclamação, confirmando o [illegible]

— Custas pelo reclamante [illegible]

[illegible]